**CULTIVOS MIRAMONTE S.A. and Flores Mocari S. A., Plaintiffs,**

v.

**UNITED STATES, Defendants,**

**Floral Trade Council, Defendant– Intervenor.**

Slip Op. 97–132.
Court No. 96–09–02222.

United States Court of International Trade.

Sept. 17, 1997.

*Böwe III,* 951 F.Supp. at 233–234.

Arnold & Porter (Michael T. Shor), Washington, DC, for Plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Velta A. Melnbrencis, Assistant Director; Of Counsel, Lucius B. Lau, Attorney, Office of the Chief Counsel for Import Ad-

ministration, Department of Commerce, Washington, DC, for Defendants.

Stewart & Stewart (Terence P. Stewart, James R. Cannon, Jr., Amy S. Dwyer, and Mara M. Burr), Washington, DC, for Defendant–Intervenor.

## OPINION

POGUE, Judge.

Plaintiffs [1] ("Miramonte") challenge certain aspects of the United States Department of Commerce ("Commerce") final determination in the consolidated fifth, sixth, and seventh administrative reviews of the antidumping order covering entries of fresh cut flowers from Colombia between March 1, 1991 and February 28, 1994. *See Certain Fresh Cut Flowers from Colombia*, 61 Fed.Reg. 42,833 (Dep't Commerce Aug. 19, 1996)(final results admin. rev.). The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (1994).

Miramonte's motion for judgment on the agency record [2] raises three issues: (1) whether Commerce's change of practice in its treatment of Miramonte's land preparation costs was in accordance with law; (2) whether Commerce's use of best information available ("BIA") to adjust Miramonte's seventh review cost data for inflation was in accordance with law, and if in accordance with law, whether Commerce's use of a twelve-month compound inflation adjustment factor was supported by substantial evidence; and (3) whether Commerce's substitution and use of a 7.0 percent U.S. interest rate in the calculation of U.S. credit expense for the seventh period for all flower types instead of the actual percent rate reported by Miramonte and verified by Commerce was supported by substantial evidence.

## BACKGROUND

Miramonte received de minimis margins in the two administrative reviews preceding the three consolidated reviews at issue here.

*See* 56 Fed.Reg. 50,554, 50,558 (Oct. 7, 1991); 59 Fed.Reg. 15,159, 15,179 (Mar. 31, 1994). Under its regulations Commerce may revoke an antidumping order covering a particular respondent if that respondent has zero or de minimis (less than 0.50 percent) dumping margins for three consecutive reviews, see 19 C.F.R. § 353.25(a)(2)(i), and that respondent will not likely sell the merchandise at less than foreign market value in the future. See 19 C.F.R. § 353.25(a)(2)(ii).

Unable to conduct the fifth and sixth administrative reviews, Commerce consolidated them with the seventh. Commerce's preliminary determination resulted in antidumping margins for Miramonte of 0.27 percent, 0.10 percent, and 0.11 percent in the fifth, sixth, and seventh administrative reviews, respectively. *See Certain Fresh Cut Flowers From Colombia*, 60 Fed.Reg. 30,270, 30,274 (Dep't Commerce June 8, 1995)(prelim. results admin. rev.). Commerce also announced its intent to revoke the antidumping duty order for Miramonte. Id. at 30,270.

In the final results Commerce found antidumping margins of 0.36, 0.00, and 2.08 percent for Miramonte in the fifth, sixth, and seventh reviews, respectively. 61 Fed.Reg. at 42,867. Thus, Miramonte's seventh period margin of 2.08 percent precluded revocation of the antidumping duty order. *Id.* at 42,833.

## STANDARD OF REVIEW

In reviewing the final results of an administrative review, the Court of International Trade must decide whether Commerce's determination is in accordance with law and whether Commerce's conclusions are supported by substantial evidence on the record. *See* Section 516A(b)(1)(B)(i) of the Tariff Act of 1930, 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, this court applies the two-step analysis articulated in *Chevron U.S.A., Inc. v. Natu-*

---

**1.** Plaintiffs Cultivos Miramonte S.A. and Flores Mocari S.A. are two related Colombian companies that produce and export fresh-cut flowers to the United States. Without objection, Commerce "collapsed" the two companies and treated them as a single entity *Columbia*, 60 Fed. Reg. 30,270, 30,271 (Dep't Commerce 1995)(prelim. results admin. rev.).

**2.** *See* USCIT R. 56.2.

*ral Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), as applied and refined by the Federal Circuit. The first task is "to determine whether Congress has 'directly spoken to the precise question at issue.'" *Id.* If the statute unambiguously deals with the subject matter in issue, the court, as well as the agency, must give effect to the intent of Congress. *Id. See, e.g., Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 402–403 (Fed.Cir.1994); *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1582 (Fed.Cir.1993). "If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. Considerable weight is accorded Commerce's construction of the antidumping laws, whether that construction manifests itself in the application of the statute, *see, e.g., Daewoo Elecs. Co. v. Int'l Union of Elec.*, 6 F.3d 1511, 1516 (Fed. Cir.1993); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed.Cir.1996), or in the promulgation of a regulation, *see, e.g., Smith–Corona Group v. United States*, 1 Fed.Cir. (T) 130, 138, 713 F.2d 1568, 1575 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

When examining Commerce's factual determinations to decide whether they are supported by substantial evidence, the court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [Commerce's] conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)(quoted in *Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966).

## DISCUSSION

The antidumping statute applicable to the consolidated reviews in issue provides that if the Department of Commerce (Commerce) through the International Trade Administration (ITA) determines that less than fair value (LTFV) sales exist and the International Trade Commission (ITC) determines that material injury exists, then the ITA will issue an antidumping order directing the United States Customs Service to collect antidumping duties equal to the amount by which foreign market value [3] exceeds the United States price [4] for the merchandise. *See* 19 U.S.C. § 1673 (1988). Commerce computed Miramonte's foreign market value using constructed value,[5] which is the sum of the costs of materials and of fabrication employed in producing such or similar merchandise, an amount for general expenses and profit, and the cost of packing the merchandise for shipment to the United States. *See* 19 U.S.C. § 1677b(e)(1) (1988).

### 1. Treatment of Miramonte's Land Adequation Costs

As part of fabrication costs, Commerce requested that Miramonte provide its indirect costs and expenses incurred in the cultivation and harvesting of its flowers. *See* ITA Section B–C Quest., Pub. Doc. 450 (4/13/94) at 66. For these costs Commerce's questionnaire instructed, "[r]egardless of whether your company capitalized expenditures or expensed them, the cost submission should be consistent with your normal production accounting system and based on your actual accounting records, if your system and records are in accordance with Generally Accepted Accounting Principles (GAAP)." Pub. Doc. 450 at 62. Miramonte reported, inter alia, depreciation expenses for its greenhous-

---

**3.** *See* 19 U.S.C. § 1677b (1988).

**4.** *See* 19 U.S.C. § 1677a (1988).

**5.** Foreign market value is computed by one of three methods: (1) home market sales; (2) third country sales; or (3) constructed value. *See* 19 U.S.C. § 1677b(a) (1988).

es and "land adequation." Land adequation was described by Miramonte as leveling terrain, digging ditches, and constructing drainage systems for its greenhouses. *See* Miramonte Public § D QR, Pub. Doc. 783 (7/8/94) at 41.

In its accounting records Miramonte allocated the costs of the greenhouses over a twenty-year period and the costs of land adequation over a five-year period. In its questionnaire response Miramonte allocated its greenhouse costs over the same twenty-year period reflected in its books; for land adequation Miramonte allocated the costs over a twenty-year period as well, arguing that "the leveling, ditching and drainage will provide a benefit over the useful life of the greenhouse." Pub. Doc. 783 (7/8/94) at 31. Miramonte also stated that its practice was "exactly the same" as its submission for the third and fourth administrative reviews, which ITA accepted (and verified in the fourth), *id.,* and that its accounting system was "primarily oriented for tax purposes." *Id.* at 21.

In the Final Results Commerce used the five year cost allocation in Miramonte's accounting records rather than the twenty-year allocation provided in Miramonte's questionnaire response. 61 Fed.Reg. 42,846. Commerce stated that its administrative practice "is to adhere to an individual firm's recording of costs in accordance with GAAP of its home country if we are satisfied that such principles reasonably reflect the costs of producing the subject merchandise." *Id.* Commerce further noted that, in contrast to the instructions contained in the questionnaire, Miramonte had departed from its normal accounting records by allocating its land adequation costs over a twenty-year period. *Id.*

Commerce rejected the twenty-year allocation because "[a]lthough Miramonte stated that it considered land adequation to have the same useful life as a greenhouse, it never explained why it treated land adequation expenses differently in its accounting records, nor did Miramonte justify why a five-year amortization did not reasonably reflect the costs of producing the merchandise." *Id.;* *see also* Commerce Public Analysis Memo, Pub. Doc. 1733 (6/28/96) at 2–3. Therefore,

Commerce "increased Miramonte's depreciation expense to reflect the amount of land adequation costs recorded in its accounting records." *Id.* at 42,847.

On its change of practice in the treatment of Miramonte's land adequation costs, Commerce stated:

> ... we first note that verification of the values used in a methodology does not indicate acceptance of the methodology itself. We agree ... that the FTC has not raised this issue in the past. An error in methodology, unmentioned and undiscovered in previous reviews, does not constitute explicit acceptance of that methodology. Nor are we bound by past reviews when we do discover a significant error. *See Shikoku Chem. Corp. v. United States,* 795 F.Supp. 417 (CIT 1992). In examining this methodology in these instant reviews, we have found the error to be significant. Miramonte's reported land adequation costs are approximately one-fourth of the amount recorded in its accounting records. Therefore, for these final results, we have increased Miramonte's depreciation expense to reflect the same amount of land adequation costs recorded in its accounting records.

*Id.*

To explain: the yearly expense from a twenty-year allocation of land adequation costs is one-fourth the yearly expense from a five-year allocation of such costs, which means lower fabrication costs, a corresponding lower constructed value, and ultimately, a lower dumping margin.

■ As noted above, Commerce stated in the Final Determination that its "practice is to adhere to an individual firms's recording of costs in accordance with GAAP of its home country if [Commerce is] satisfied that such principles reasonably reflect the costs of producing the subject merchandise," 61 Fed. Reg. at 42,846. This practice has been upheld by this court. *See, e.g., FAG U.K. Ltd. v. United States,* 945 F.Supp. 260, 271 (CIT 1996)("reliance on an individual firm's home country GAAP provides an objective standard by which to measure costs, and allows a respondent a predictable basis on which to

compute costs."). Commerce may, however, as it has done from time to time in the investigation and administrative reviews of this case, reject the use of home country GAAP as the basis for calculating production costs if the accounting methods at issue unreasonably distort or misstate costs for purposes of an antidumping analysis. *See* 61 Fed.Reg. at 42, 847 (cmt. 15).

For the third and fourth administrative reviews Commerce accepted Miramonte's reported land adequation costs which were allocated over a twenty-year period. In those reviews FTC did not challenge Commerce's treatment of these costs. For the consolidated reviews at issue here, Commerce changed its position, no longer accepting Miramonte's reported land adequation costs, and instead using the figures from Miramonte's books and records.

■ Commerce has the flexibility to change its position providing that it explains the basis for its change[6] and providing that the explanation is in accordance with law and supported by substantial evidence.[7]

Unlike the changes in other cases considered by this court, the change at issue here does not involve a new methodology or practice. *See, e.g., Hussey Copper, Ltd. v. United States*, 18 CIT 454, 457–458, 852 F.Supp. 1116, 1120 (1994) ("[Respondent] had no reason to believe that its method did not provide the 'best estimates' of the ... cost, since the same method had been accepted and verified by Commerce in the previous investigation and Commerce never indicated during the proceeding of this administrative review that [respondent's] method was unacceptable."); *Shikoku Chem. Corp. v. United States*, 16 CIT 382, 388, 795 F.Supp. 417, 421–22 (1992).[8] Here, the administrative practice of

**6.** "The underlying ground of that principle is that the reviewing court should be able to understand the basis of the agency's action and so may judge the consistency of that action with the agency's general mandate." *Chennault v. Department of Navy*, 796 F.2d 465, 467 (Fed.Cir.1986). The rule also assures that an administrative agency will be "faithful and not indifferent to the rule of law," *Columbia Broadcasting System, Inc. v. FCC*, 147 U.S.App. D.C. 175, 183, 454 F.2d 1018, 1026 (1971), and "prohibit[s] the agency from adopting significantly inconsistent policies that result in the creation of 'conflicting lines of precedent governing the identical situation.'" *Davila–Bardales v. INS*, 27 F.3d 1, 5 (1st Cir.1994)(quoting *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 36 (1st Cir.1989)); *see also Hussey Copper, Ltd. v. United States*, 17 CIT 993, 997, 834 F.Supp. 413, 418 (1993)(" 'This rule is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure consistency in an agency's administration of the statute.' ")(quoting *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988)). "This is not to say that an agency, once it has announced a precedent, must forever hew to it. Experience is often the best teacher, and agencies retain a substantial measure of freedom to refine, reformulate, and even reverse their precedents in the light of new insights and changed circumstances. However, the law demands a certain orderliness. If an administrative agency decides to depart significantly from its own precedent, it must confront the issue squarely and explain why the departure is reasonable." *Davila–Bardales*, 27 F.3d at 5.

**7.** The court's review of an agency's change of position or practice will typically center on whether the action was arbitrary. A change is arbitrary if the factual findings underlying the reason for change are not supported by substantial evidence. Apart from factual findings, agency arbitrariness may also manifest itself in the particular reasoning offered by the agency; principally, if the reasoning is inconsistent with the statutory mandate, or, to a lesser extent, if the reasoning (or lack thereof) violates general principles of administrative law, *see, e.g., Hussey Copper, Ltd. v. United States*, 17 CIT 993, 997, 834 F.Supp. 413, 418 (1993) or offends standards of procedural fairness implied in the statute. *See, e.g., Hussey Copper, Ltd. v. United States*, 18 CIT 454, 457–458, 852 F.Supp. 1116, 1120 (1994); *Shikoku Chem. Corp. v. United States*, 16 CIT 382, 388, 795 F.Supp. 417, 421–422 (1992). In this context the court reviews an agency change of position or practice to insure it is "in accordance with law."

**8.** In *Shikoku* Commerce adopted a slightly improved allocation methodology to calculate a packing adjustment to home market value in its fifth administrative review. 16 CIT at 384–86, 795 F.Supp. 417, 419–20. The methodology differed from the one used by the Department in the first through fourth reviews. For the second, third, and fourth reviews, respondent had zero or de minimis margins. *Id.* at 383, 795 F.Supp. at 418. Although the court found that there was a marginal increase in accuracy as a result of the new methodology, the court concluded, based on "principles of fairness" and "administrative equity," that "Commerce did not have adequate reasons for its last minute change in methodology," given the unchanged fact pattern from the prior reviews and the lack of discovery of a significant error. *Id.* at 388, 795 F.Supp. at 421–422.

adhering to books and records kept in accord with home country GAAP, unless distortive, had not changed from one review to the next; all that changed, apparently, was Commerce's weighing of Miramonte's evidence on the question of distortion. Thus, the issue in this case does not involve a change in methodology which implicates issues of statutorily implied standards of procedural fairness. Here, administrative practice had not changed, and presumably, having known what that practice was, Miramonte submitted evidence of distortion that it deemed sufficient to justify deviation from its books and records. Consequently, *Shikoku,* predicated as it is on concepts of procedural fairness and administrative equity, is not a guide for the resolution of the present case.

█ Notwithstanding its verification and acceptance of Miramonte's response in the fourth administrative review, Commerce stated that it had committed a significant error by using Miramonte's twenty-year cost allocation in prior reviews. Commerce need not perpetuate an error from one review to the next. *See Gilmore Steel, Corp. v. United States,* 7 CIT 219, 224, 585 F.Supp. 670, 674 (1984) ("A contrary holding would be tantamount to saying that once an error initially evades detection, the ITA is thereafter powerless to take remedial steps, thereby compounding the error."). Acknowledgment of an error is therefore a proper legal basis for Commerce to change its position given an identical set of facts.

█ The difficulty here is that Commerce's specific findings are not supported by substantial evidence. Commerce stated in the final determination that Miramonte "never explained why it treated land adequation expenses differently in its accounting records, . . . ." 61 Fed.Reg. at 42,847. Miramonte did, however, alert Commerce that its accounting records were "primarily oriented for tax purposes." Miramonte Public § D QR, Public Doc. 783 (7/8/94) at 21. This may or may not have been a sufficient explanation, *see, e.g., Hercules, Inc. v. United States,* 11 CIT 710, 755–56, 673 F.Supp. 454, 491

(1987)(holding that mere assertion that accounting records were tax-motivated and not reflective of true costs was insufficient), but it was some explanation. Commerce's conclusion that Miramonte "did not justify why a five year amortization did not reasonably reflect the cost of producing the merchandise," 61 Fed.Reg. at 42,847, is similarly at odds with the administrative record. Miramonte explained that the land preparation provided a useful benefit for the life of its greenhouses which lasted twenty years. It therefore allocated the land preparation costs over twenty years. Here again, this explanation may or may not have been sufficient, but it nonetheless was some justification for Miramonte's claim that the five-year amortization did not reasonably reflect the cost of producing the merchandise. The record does not support the finding that Miramonte never explained or justified its questionnaire response. Lacking the requisite substantial evidence, Commerce's explanation of its change of practice cannot be sustained. The matter must therefore be remanded for Commerce to articulate a reason for its change that is supported by substantial evidence on the record. *See Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)(stating that if the contemporaneous explanation of the agency is based on a finding that is not sustainable on the administrative record, the matter must be remanded for further consideration.).

█ If Commerce overlooked the question of distortion when it previously accepted Miramonte's twenty-year cost allocation for land preparation, then Commerce must articulate this rationale; the Court cannot supply a rationale for this discretionary decision. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947)(". . . a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").[9] While the court will "up-

---

9. At oral argument, counsel for Defendant and counsel for Defendant–Intervenor suggested that a fair reading of the final determination suggests

that Commerce's error from the prior review involved the Department's failure to examine closely the question of distortion, and that having

hold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp. Inc. v. Arkansas–Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), "the agency must examine the relevant data and articulate a satisfactory explanation for its action. . . ." *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

## 2. Best Information Available

### A. Application of BIA to Adjust Miramonte's Costs for Inflation

■ Normally, Commerce requires respondents to report pre-production expenses consistent with their home country GAAP, which typically are reflected in respondents' ordinary books and records. *See* 61 Fed. Reg. at 42,847. In prior reviews Commerce accepted pre-production expenses that were amortized over a longer period than the period contained in respondents' books and records. Commerce terms this alternative approach to pre-production expenses the "Crop Adjustment Method." *See* 61 Fed.Reg. at 42,847 (cmt. 15); *see also Fresh Cut Roses from Colombia,* 60 Fed.Reg. 6980, 6997–98 (1995) (cmt. 19) (accepting pre-production costs that differed from accounting records).

In its Section D questionnaire response Miramonte acknowledged that its methodology for reporting cost data in the antidumping questionnaire differed from that used in its ordinary books and records. *See* Miramonte Public § D QR, Pub. Doc. 783 (7/8/94) at 30. As noted above, Miramonte explained that its accounting system was "primarily oriented for tax purposes" and, therefore, Miramonte had developed a different methodology to report costs for purposes of these reviews, including the third and fourth reviews. *Id.* at 21.

Miramonte did not amortize pre-production costs for pompons or chrysanthemums in

its June 8, 1994 or August 22, 1994 questionnaire responses. Instead, it used offsets, shifting the costs according to the production cycle of these flower types. Miramonte explained that it took its propagation costs from the first month and reported them as expensed four months later when the flowers associated with such propagation expenses were harvested. Similarly, Miramonte took its production expenses from the first month and reported them as expensed three months later when the flowers were harvested. Commerce verified this method of reporting costs.

In its preliminary determination, Commerce noted a change in Colombian GAAP effective January 1, 1992. *Id.* at 30,274. According to Colombian law, flower growers were required to revalue certain financial statement accounts to reflect the effects of inflation experienced during each financial reporting period. Commerce issued a supplemental questionnaire instructing certain respondents to report their pre-production costs adjusted for inflation:

> If you have reported amortized pre-production costs in Tables 2A, 2B, or 2C . . ., revise these expenses so that they are based on asset values which, in accordance with Colombian GAAP, have been adjusted to reflect the effects of inflation and submit new diskettes.

ITA Public Supp. Quest., Pub. Doc. 1508 (6/22/95) at 1.

Miramonte indicated that it was confused about how to report inflation adjustments for the pre-production costs reported in its questionnaire response. *Id.* at 4. Miramonte's accounting books did not contain inflation adjustments based on the three and four-month offset periods used in the questionnaire response. In its books, Miramonte used one-month offset periods. Rather than submit inflation adjustments for the offset costs reported in its original questionnaire response, Miramonte responded to Commerce's supplemental questionnaire by re-

corrected that error in the present consolidated reviews, Commerce lawfully concluded that Miramonte had failed to make a sufficient showing of distortion to justify deviating from the costs in its books and records. After careful review of

the final determination, the Court is reluctant to join this interpretation and thereby supply a rationale for the decision not articulated by the agency.

porting the costs and inflation adjustments for propagation and production expenses contained in its books and records.

Commerce concluded that Miramonte erred because its reported inflation-adjusted costs were inconsistent with the previously reported costs which had been verified by Commerce. When compared with the verified cost data, certain line totals in the inflation adjusted data were actually less than line totals in verified reported costs. *See* Commerce Public Analysis Memo, Pub. Doc. 1733 (6/28/96) at 2. Having concluded Miramonte's submission was non-responsive, Commerce used the best information available (BIA) to increase Miramonte's expenses, except for depreciation, in all three review periods to account for inflation. *Id.*

Miramonte challenges Commerce's application of BIA, arguing that the resort to BIA was not in accordance with law. Section 776(c) of the Tariff Act of 1930, as amended 19 U.S.C. § 1677e(c)(1988) states that ITA "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." Under ITA's regulations, BIA is used whenever ITA "(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted." 19 C.F.R. § 353.37(a).

■■■■ Commerce must "fairly request" the data prior to resorting to any secondary information. *See Koyo Seiko Co. v. United States,* 92 F.3d 1162, 1165 (Fed.Cir.1996). Once Commerce has done so, it possesses the "discretion to determine whether a respondent has complied with an information request." *Daido Corp. v. United States,* 893 F.Supp. 43, 49–50 (CIT 1995) (citing S.Rep. No. 249, 96th Cong., 1st Sess. at 98 (1979); H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 484).

Although the supplemental questionnaire did not address Miramonte's situation with unmistakable clarity, (Miramonte did not re-

port "*amortized* pre-production costs" in its original questionnaire response), the supplemental questionnaire nonetheless fairly requested inflation adjustments, and Miramonte's response was inappropriate given the facts of these consolidated administrative reviews. The questionnaire did not request that Miramonte abandon its previously verified reported costs, or substitute completely different, unverified cost data.

It was clear from the original questionnaire that Commerce was seeking an accurate, verifiable statement of pre-production costs. It was clear from the supplemental questionnaire that Commerce sought an inflation adjustment to these costs. *See* ITA Public Supp. Quest., Pub Doc. 1508 (6/22/95) at 21 ("revise these expenses so that they are based on asset values which, in accordance with Colombian GAAP, have been adjusted to reflect the effects of inflation."). Miramonte's "offsets" approach, an adaptation of the "Crop Adjustment Method" for which no amortization of costs was made, was verified and accepted by Commerce. The clear intent of the supplemental questionnaire was to acquire inflation adjustments for these previously reported and verified costs. Although the questionnaire used the qualifier "amortized," presumably because most respondents had amortized costs in one form or another in their earlier responses, the fair import of the request was clear, and it applied with equal force to Miramonte's "offsets" situation.

By adapting the "Crop Adjustment Method" to its own uses, Miramonte accepted the responsibility to ask Commerce for clarification of any information requests that could involve that adaptation. In its original questionnaire response Miramonte departed from its ordinary books and records in reporting pre-production costs using a three-month rather than the one-month offset period. Such adjustments obligated Miramonte to clarify any confusion with the requirements of the supplemental questionnaire as they pertained to Miramonte. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, et al.,* 57 Fed.Reg. 28,360, 28,381 (Dep't Commerce 1992) (final results admin. rev.) ("If a re-

spondent found the requirements to be unclear, then the burden is on the respondent to ask the Department for guidance."), *aff'd*, *Emerson Power Transmission Corp. v. United States*, 19 CIT —, 903 F.Supp. 48, 55 (1995) (affirming ITA's resort to BIA when questionnaire instructions were clear on their face despite respondent's misinterpretation).

█ Having concluded that Commerce's supplemental questionnaire fairly requested inflation adjustments to reported pre-production costs, the remaining question is whether Miramonte properly responded to that request. Commerce explained in the Final Results that "in many countries that experience high inflation, GAAP requires that fixed assets be indexed (i.e., increased) annually to reflect the increasing nominal value of those assets as stated in prevailing currency units." 61 Fed.Reg. at 42,845. In its case brief Miramonte acknowledged that this adjustment would lead to an upward adjustment to asset values. *See* Asocoflores Case Brief, Pub. Doc. 1695 (8/11/95) at 14 ("the value of assets must be adjusted to reflect the hypothetical increase in value due to inflation") (emphasis added). When Commerce asked respondents to "revise these expenses so that they are based on asset values which, in accordance with Colombian GAAP, have been adjusted to reflect the effects of inflation," ITA Public Supp. Quest., Pub. Doc. 1508 (6/22/95) at 21, both the agency and Miramonte recognized that the adjustment to be made would result in increases to reported expenses.

Miramonte also demonstrated this expectation of an increase in expenses when it submitted its July 18, 1995 response to Commerce's inflation adjustment questionnaire. In its response, Miramonte stated that "[t]his adjustment includes both the additional income by monetary correction (the additional value in the asset) and the additional charge in the cost of production." Miramonte Public Supp. QR, Pub. Doc. 1580 (7/18/95) at 4 (emphasis added).

Upon review of the underlying numbers accompanying Miramonte's July 18, 1995, response, Commerce recognized that the inflation adjustment to Miramonte's " 'Crops in Process' account was distributed on a monthly basis to each flower type based on the same methodology it used to allocate the depreciation expense." ITA Public Analysis Memo, Pub. Doc. 1733 (6/28/96) at 2. Commerce "examined Miramonte's data and discovered that, while some line totals increased, others stayed the same. Moreover many line totals decreased." *Id.*

Confronted with cost data which had been previously verified, and written narrative from Miramonte which indicated that the adjustment would result in increases to Miramonte's line totals (a result that Commerce had expected based on Colombian GAAP), Commerce viewed the existence of unchanged data and data which decreased in value as an inconsistency, and concluded that Miramonte had not made the inflation adjustment as requested by Commerce. Commerce's finding that Miramonte failed to respond properly to its request for inflation adjustment data is supported by substantial evidence,[10] and, accordingly, Commerce's ap-

---

10. Miramonte has attempted to demonstrate that there was no inconsistency in its cost data by referencing "its September 10, 1996 request for correction of clerical errors...." Miramonte brief at 30. The final results in this case were signed by the Assistant Secretary for Import Administration on August 9, 1996, and published by Commerce on August 19, 1996. *See* Pub. Doc. 1843; 61 Fed.Reg. 42,833 (Aug. 19, 1996). As defined by the statute, the record for review includes "a copy of all information presented to or obtained by [Commerce] during the course of the administrative proceeding...." 19 U.S.C. § 1516a(b)(2)(A)(i) (emphasis added). This statutory language "has been interpreted by this Court to mean that, barring exceptional circumstances, 'the scope of the record for purposes of judicial review is based upon information which was "before the relevant decision-maker" and was presented and considered "at the time the decision was rendered." ' " *Kerr–McGee Chem. Corp. v. United States*, 955 F.Supp. 1466, 1472 (CIT 1997) (quoting *Beker Industries Corp. v. United States*, 7 CIT 313, 315 (1984)). No "exceptional circumstances" exist here; rather, Commerce based its decision to reject Miramonte's inflation adjustments upon inconsistencies contained in the administrative record. Miramonte's request for correction of clerical errors was submitted on September 10, 1996, which as after Commerce rendered its decision on Miramonte's response. *See* Pub. Doc. 1843. The September 10 response was outside the administrative record and Commerce properly did not consider it for purposes of the final results.

plication of BIA to adjust Miramonte's verified cost data for inflation was in accordance with law.

██ An additional factor supports Commerce's application of BIA in this situation. Section 776(b)(2) of the Tariff Act of 1930, as amended (19 U.S.C. § 1677e(b)(2)) and 19 C.F.R. § 353.25(c) require ITA to verify all information relied upon in revoking an order. If the agency is unable to verify the accuracy of the information submitted, Commerce may resort to "best information available." Miramonte submitted its revised pre-production costs and accompanying inflation adjustments after the preliminary determination and after verification. *See* Miramonte Public Supp. QR (7/18/95), Pub. Doc. 1580 at 2–4. Acceptance of the revised costs at that date would have required Commerce to re-verify Miramonte's pre-production costs. Commerce was "unable to verify, within the time specified, the accuracy and completeness of the [new] factual information submitted," 19 C.F.R. § 353.37(a)(2), and therefore, use of best information available was appropriate.

If data are accepted after verification, there is not only no guarantee of accuracy, but opposing parties are denied the opportunity to have their claims tested through the verification process. Thus, Miramonte's submission of revised pre-production costs was untimely and resort to "best information available" was in accordance with law.

## B. Selection of Inflation Adjustment Factor

Resort to best information available may be either "total" or "partial." *See National Steel Corp. v. United States,* 870 F.Supp. 1130, 1135 (CIT 1994). Because Commerce determined that only part of Miramonte's data was deficient (i.e., the inflation adjustment), it applied partial BIA for Miramonte.

As partial best information available, ITA increased Miramonte's expenses, except for depreciation, in all three review periods using the Colombian PAAG inflation rates.[11] *See* ITA Public Analysis Memo, Pub. Doc. 1733 (6/28/96) at 2. Thus, for the seventh review period, Commerce used an inflation adjustment factor of 21.24 percent which reflected the cumulative inflation rate for the twelve-month period of September 1992 through August 1993. *See* ITA Public Analysis Memo at Attachment, Pub. Doc. 1733 (6/28/96).

For all respondents, including Miramonte, that failed to adjust their pre-production expenses for the effects of inflation, Commerce adjusted those expenses for the sixth and seventh reviews using twelve months of Colombian inflation rates ending in mid-year because "respondents generally amortized pre-production costs over eighteen months." Commerce Public Cost Memo, Pub. Doc. 1721 (2/20/96) at 2. Attached to the public cost memorandum was a chart which listed the monthly Colombian inflation index and which calculated cumulative inflation indices for the fifth, sixth, and seventh periods of review.

Although Miramonte produced standard carnations for export during the fifth review period and submitted constructed value information for this flower type, *id.* at 28; Miramonte Public Supp. QR at 4, Pub. Doc. 945 (8/22/94); Miramonte Verification Report at 1, Pub. Doc. 1270 (10/24/94), Miramonte primarily produced pompons and chrysanthemums for the periods of investigation. The production cycle for pompons and chrysanthemums is shorter than the production cycle for carnations. Miramonte, therefore challenges Commerce's application of an inflation adjustment factor in the seventh review based on the production cycle of carnations.

The statute requires Commerce to resort to "best information available" under certain circumstances, but does not specify what information should be selected as "best information available." 19 U.S.C. § 1677e(c) (1988). Through counsel, Commerce concedes that the selection of an inflation adjustment factor based on the production cycle of carnations was an inadvertent error and requests a remand to permit re-calculation of Miramonte's inflation adjustment factor based on the production cycles of chrysanthe-

---

**11.** Each month the Government of Colombia publishes an inflation index, known as the percent annual inflation rate ("PAAG") index. Pub. Doc. 1695 at 14.

mums and pompons. FTC argues that the selection of an inflation-adjustment factor based on the production cycles of carnations was appropriate given that Miramonte had reported some cost information for carnations in the fifth review. FTC also argues that such an inflation adjustment factor is appropriately adverse to Miramonte's interests given their noncompliance with Commerce's request.

The Court agrees that it was error for Commerce to consider only a carnation-based inflation adjustment factor to calculate Miramonte's inflation-adjusted costs. Commerce requests remand to calculate a new inflation adjustment factor for Miramonte. The issue will be remanded for Commerce to do this, but Commerce must also explain the appropriateness of the amount it selects given FTC's arguments.

### 3. Amount of Interest Rate in Calculation of U.S. Credit Expense

Miramonte challenges Commerce's application of a 7.0 percent U.S. interest rate in the calculation of U.S. credit expense for the seventh period for all flower types instead of the actual percentage rate reported by Miramonte and verified by Commerce. Commerce has requested a remand to permit recalculation of Miramonte's U.S. credit expense using the actual percentage rate. FTC does not object to a remand. Accordingly, the matter will be remanded for Commerce to make the appropriate correction.

### CONCLUSION

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the Department of Commerce's final determination in *Certain Fresh Cut Flowers from Colombia,* 61 Fed.Reg. 42,833 (Dep't Commerce Aug. 19, 1996)(final results admin. rev.) is sustained in part and remanded in part; and it is further

ORDERED that the issue of Commerce's treatment of Miramonte's land adequation costs is remanded for further consideration in accord with the Court's opinion; and it is further

ORDERED that Commerce's decision to use best information available to adjust Miramonte's pre-production costs for inflation is sustained; and it is further

ORDERED that the case is remanded to Commerce to (1) select an inflation adjustment for plaintiffs' sales of chrysanthemums and pompons based upon the production cycle for chrysanthemums and pompons using information contained in the administrative record, and (2) correct the selection of the interest rate for imputed credit calculations; and it is further

ORDERED that the remand results are due on **Tuesday, November 18, 1997;** comments and responses are due on **Wednesday, December 17, 1997;** any rebuttal comments are due on **Tuesday, January 6, 1998;** and it is further

ORDERED that plaintiffs' motion is denied in all other respects and the final results of the administrative reviews are sustained in all other respects.