Slip Op. 04 - 108

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| AK STEEL CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| UNITED STATES, | : | Court No. 03-00102 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| THYSSENKRUPP NIROSTA GmbH and | : | |
| THYSSENKRUPP VDM GmbH, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

[On Rule 56.2 motion for summary judgment regarding deductibility of indirect selling expenses and inference on missing data at antidumping duty administrative review, judgment for the defendant.]

Decided: August 25, 2004

*Collier Shannon Scott, PLLC*, Washington D.C. (*David A. Hartquist*, *Jeffrey S. Beckington*, *Adam H. Gordon*), for the plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Cristina C. Ashworth*); Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*Elizabeth Doyle*, *Bernice Brown*), of counsel; Office of Assistant Chief Counsel, International Trade Litigation, U.S. Bureau of Customs and Border Protection (*Ellen Daly*), of counsel, for the defendant.

*Hogan & Hartson L.L.P.* (*T. Clark Weymouth*, *Craig Lewis*, and *Behnaz L. Kibria*), Washington, D.C., for the defendant-intervenors.

**OPINION**

Plaintiff AK Steel Corporation, a domestic petitioner, contests *Stainless Steel Sheet and Strip*

*in Coils From Germany; Notice of Final Results of Antidumping Duty Administrative Review*, 68

Fed. Reg. 6716 (Feb. 10, 2003) ("*Final Results*"), PR[1] 50 (amended at 68 Fed. Reg. 14193 (Mar. 24,

2003), PR 54), as administered by the Department of Commerce, International Trade Administration

("Commerce" or the "Department"). This opinion presumes familiarity with general antidumping

law. The administrative review of the outstanding antidumping order[2] covers the period July 1,

2000, through June 30, 2001 ("POR"), and entries of subject merchandise from respondent

ThyssenKrupp Nirosta GmbH ("ThyssenKrupp"), defendant-intervenor herein.

AK Steel raises two claims. The first is that Commerce improperly failed to deduct all

relevant indirect selling expenses from the constructed export price of the subject merchandise

before making the statutory comparison to normal value. The other is that Commerce erred by

failing to apply partial adverse facts available to certain home market sales that were reported with

incomplete data. Commerce and the defendant-intervenors argue in favor of sustaining the *Final

Results* as is. For the following reasons, judgment for the defendant is appropriate.

### *Jurisdiction and Standard of Review*

This Court has jurisdiction over the matter pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and

28 U.S.C. § 1581(c). A final antidumping duty review determination unsupported by substantial

evidence on the record or otherwise not in accordance with law will not be sustained. 19 U.S.C. §

1516a(b)(1)(B)(i).

---

[1] The public and proprietary documents of the administrative record are herein referenced "PR" and CR," respectively. "Stainless steel sheet and strip" is occasionally referenced in the administrative record as "S4."

[2] *See Notice of Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order; Stainless Steel Sheet and Strip in Coils from Germany*, 64 Fed. Reg. 40557 (July 27, 1999).

### *Discussion*

### I. *Indirect Selling Expenses*

AK Steel's first claim concerns certain statutory adjustments to the U.S. price of the subject merchandise. Each of Thyssenkrupp's sales to the U.S. consisted of an "upstream" sale from the German producer/exporter to an affiliated U.S. reseller, and a "downstream" sale from the affiliate to an unaffiliated U.S. customer. During the first three months of the POR, the subject merchandise entered the U.S. through Krupp Hoesch Steel Products, Inc. ("KHSP"); thereafter, it entered through ThyssenKrupp Nirosta North America, Inc. ("TKNA"), a newly formed subsidiary into which the KHSP's sales functions were consolidated.[3] *See* CR1/PR 10 at A-9 -- A-10, A-17. Under the antidumping statute, such transactions are valued for antidumping duty purposes at "constructed export price" ("CEP"). *See* 19 U.S.C. § 1677a(b).[4] CEP essentially takes the "downstream" sale price to the first unaffiliated purchaser and adjusts it to approximate, "as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers." Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. I, 103d Cong. 2d Sess, at 823 (1994) ("SAA"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163. The objective of such deductions is to make comparable comparisons, at the same level of trade, to

---

[3] In a separate segment of the proceeding, Commerce examined the respondent's corporate reorganization and determined *inter alia* ThyssenKrupp Nirosta GmbH to be the successor-in-interest of Krupp Thyssen Nirosta, GmbH ("KTN") and TKNA to be the successor-in-interest of Krupp Thyssen Nirosta North America, Inc. ("KTNA"). *See Stainless Steel Sheet and Strip in Coils from Germany: Final Results of Changed Circumstances Antidumping Duty Administrative Review*, 67 Fed. Reg. 61319 (September 30, 2002). In the interest of clarity, KTN as well as ThyssenKrupp VDM GmbH are included in references to "ThyssenKrupp" as the context may require.

[4] *See also* 19 U.S.C. §§ 1675(a)(2)(A), 1677(35)(A).

"normal value." *See Micron Technology, Inc. v. United States*, 243 F.3d 1301, 1304 (Fed. Cir. 2001).

> Among the expenses to be deducted are indirect selling expenses (ISEs), *i.e.*,
>
>> expenses which do not meet the criteria of "resulting from and bearing a direct relationship to" the sale of the subject merchandise, do not qualify as assumptions, and are not commissions. Such expenses would be incurred by the seller regardless of whether the particular sales in question are made, but reasonably may be attributed (at least in part) to such sales.

SAA at 824, 1994 U.S.C.C.A.N. at 4164. According to Commerce, deductible ISEs must be "associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser," and where the expense was borne or when it was paid is irrelevant that consideration. 19 C.F.R. § 351.402(b). The Court of Appeals for the Federal Circuit has held that to be deductible an ISE must "aris[e] specifically out of the sale of the subject merchandise in the United States to an unaffiliated purchaser, as opposed to those general expenses incurred by the foreign producer or exporter in all sales, without regard to the identity or location of the purchaser." *Micron*, 243 F.3d at 1309 (quoting SAA at 824, 1994 U.S.C.C.A.N. at 4164).

AK Steel's claim concerns ISEs that ThyssenKrupp reported as relating to the CEP transactions with TKNA. ThyssenKrupp reported these in field DINDIRSU of its database and explained in its narrative that TKNA (and KHSP) had incurred ISEs in Germany that related to "sales to the U.S. market" which were paid or borne by ThyssenKrupp. The ISEs included technical services, marketing, sales support, and transportation support. CR 2/PR 12 at C-39.[5] AK Steel

---

[5] The allocation of the "expenses associated with these activities are reported in Field DINDIRSU[; s]eparate rates were calculated for non-precision band sales to the U.S. via KHSP and KTNA and precision band sales to the U.S. via" ThyssenKrupp's Canadian affiliated reseller. PR

(continued...)

argues that ThyssenKrupp "acknowledged" that these activities were "directly related" to the downstream sales, that the selling functions and expenses were "low" or "minimally" related to the CEP transactions, that ThyssenKrupp "incurs all U.S. transportation expenses," that the staffs of Krupp Thyssen Nirosta Export (an affiliated German exporter) and TKNA "always" serve as points of contact for U.S. sales negotiations, and that ThyssenKrupp's staff members "occasionally" participated in U.S. sales visits and discussions with U.S. customers. Pl's Br. at 15 (referencing CR 1/PR 10 at Ex's A-4-B & A-4-C; CR 7/PR 22 at C). Mainly, however, AK Steel's position is that the ISEs should have been deducted because they are identical in nature to ISEs that had been deducted in the prior review. AK Steel argues that Commerce must be consistent in its application of the law, and that there has been no significant change of circumstances justifying different treatment in this review. Further, it argues that Commerce's justification is based upon mere inclusion in this administrative record of the issues and decision memorandum from the preceding review, which does not constitute substantial evidence justifying the different decision here from that reached in the preceding review. Pl's Br. at 13-19.[6]

---

[5] (...continued)
12/CR 2 at C-39. ThyssenKrupp also reported certain ISEs as relating to the downstream sales in a separate Field (INDIRSU). The deduction of these ISEs in the calculation of CEP, as well as the deduction of "upstream" ISEs involving KHSP (*see infra*), is uncontested.

[6] In that review, covering the period January 8, 1999 through June 30, 2000**,** Commerce verified the reported ISEs and deducted them in the CEP calculation because it considered that the expenses were associated with economic activities in the United States. *See Issues and Decision Memorandum for the Administrative Review of Stainless Steel Sheet and Strip in Coils From Germany: January 4, 1999 through June 30, 2000* (Feb. 11, 2002) (Comment 4), *referenced in* 67 Fed. Reg. 7668, 7670 (Feb. 20, 2002) ("99-00 Issues Memo"). *See also* PR 28/CR 10 at 3.

ThyssenKrupp argues that it never "acknowledged" that the DINDIRSU ISEs were "directly related" to the downstream sales. Although ThyssenKrupp staff "occasionally visited and sat in on talks with customers," the German exporter/producer was not involved in negotiating sales with U.S. customers. Def-Int's Br. at 6 (referencing PR Doc 22 at C-8). ThyssenKrupp highlights the explanation and examples of ISEs in Commerce's *Antidumping Manual* and argues that the ISEs at issue here relate to the CEP level of sale and are not expenses associated with economic activity occurring in the United States:

> The CEP deduction is limited to the expense of economic activity occurring in the United States. The SAA also specifies that direct selling expenses may only be deducted to the extent they are incurred after importation (*See* SAA at 153/823.) Accordingly, all U.S. direct expenses incurred in the United States associated with the sale to the first unaffiliated U.S. customer would be included in this deduction, as would all indirect expenses incurred in the United States by a U.S. affiliate of the foreign exporter. Direct and indirect expenses incurred in the foreign market on behalf of U.S. sales (e.g. lodging expenses paid for by the respondent for U.S. customer's technicians taking training in the respondent's country (direct) and salaries of salesmen in the respondent's country who take orders from the U.S. affiliate, and foreign inventory carrying costs (indirect)) do not form part of the deduction . . .

> As a rule of thumb, if the expense is incurred in the United States by the affiliated importer or the exporter, it should be deducted. However, if the expense is for a foreign activity, it should not be deducted.

*Antidumping Manual* at Chapter 7, Section III.C at 12 (Court's omission).

In the *Final Results*, Commerce did not deduct from CEP the ISEs charged by ThyssenKrupp to TKNA because, Commerce concluded, they were associated with the CEP level of sale. Commerce explained that the deduction of similar ISEs in the preceding review was the result of "a unique situation" relating to the closure of KHSP during which ThyssenKrupp had "played a more active role [in] sales to the unaffiliated U.S. customer." *See* PR 47 at 14-15.

At first blush, the ISEs appear to be the same kinds of activities in both administrative reviews. Thus, AK Steel's assertion that there is "no evidence of any change in the nature of the expenses or the activities to which they relate[,] only the identity of KTN's affiliated U.S. reseller, on whose behalf these expenses were incurred, changed"[7] impugns Commerce's conclusion that ThyssenKrupp was "more active" in sales to the unaffiliated U.S. customer(s) in the preceding review. The Court does not opine on whether the deduction in the preceding review was proper, but the determination at issue involves not a change of position[8] but the application of agency discretion to the deductibility of ISEs after considering the degree of producer/exporter activity to be imputed to the downstream sales. That is, Commerce considered AK Steel's argument on interpreting the ISEs at issue as related to the downstream sales but came to a different conclusion regarding their relationship to downstream sales. AK Steel's argument shows neither detrimental reliance nor unreasonableness in Commerce's explanation for the different result in this review, and a different conclusion may not be judicially superimposed because "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026 (1966) (citations omitted). Substantial evidence and law therefore support Commerce's determination.

---

[7] Pl's Repl. at 2.

[8] The general proposition is that Commerce may change a previously-held position if it explains the basis for the change and the change is in accordance with law and supported by substantial evidence. *See, e.g., Viraj Forgings, Ltd v. United States*, 27 CIT __, ___, 283 F. Supp.2d 1335, 1342-43 (2003); *Cultivos Miramonte S.A. v. United States*, 21 CIT 1059, 1064, 980 F. Supp. 1268, 1274 (1997).

II. *Incomplete Product Characteristics Data*

AK Steel also contests Commerce's conclusion that ThyssenKrupp acted to the best of its

ability in responding that data for certain product characteristics could not be provided without being

unduly burdensome.  ThyssenKrupp claimed it could not provide complete data for rolling process

(hot or cold), gauge, finish, width, and temper for an affiliated home market reseller, Nirosta Service

Center GmbH ("NSC"), because

> a small number of German sales, primarily non-prime merchandise, were sold
> as "product bundles," comprised of miscellaneous products.  For such sales,
> NSC groups a large number of products together and sells the group when the
> product characteristics of the sold goods [are] irrelevant to the purchaser
> (*e.g.*, sales to a stainless scrap consumer).

PR 12/CR 2 at B-7, B-8--B-11.

Commerce issued a supplemental questionnaire requesting that ThyssenKrupp either remedy

the missing product characteristics or explain in detail why it was unable to provide the requested

information.  PR 19/CR 6.  ThyssenKrupp submitted answers to the supplemental questionnaire on

April 26, 2002.  PR 22/CR 7.  In response, ThyssenKrupp explained  that NSC had sold some items

in "bundles," that the product characteristics for such merchandise bundles could only be

extrapolated from the invoices and "could vary from package to package within each invoice line-

item," and that in order to provide the requested information, which involved a large number of

missing data observations, NSC would have to review the packing lists manually, "an exercise that

was not possible within the time period" allowed.  *Id*. at B-3--B-4.

Commerce sent a second supplemental questionnaire again asking ThyssenKrupp for the

missing information.  PR 27.  ThyssenKrupp responded that it had attempted to the best of its ability

to fill in the missing product characteristics but, for a small number of sales, could not supply the necessary information:

> The sales in question consist mostly of non-prime merchandise sales by Nirosta Service Center ("NSC") and a very small subset of prime merchandise sales by NSC and Thyssen Schulte ("TS"). In preparing their earlier-filed databases for submission to the Department, these companies attempted to the best of their ability to fill in missing product characteristic data through the means available to them. For NSC, product characteristic data was merged from the company's electronic packing list. For TS, company personnel manually reviewed over 3,000 invoices to fill in missing product characteristic data. The data that has been provided to the Department reflects the results of these efforts.

> The remaining sales with missing product characteristic data either will not factor into the Department's analysis or represent an inconsequential portion of home market sales. . . . Except for a very small quantity of non-prime resales of returned merchandise, the U.S. importers sold only prime merchandise in the U.S. market. Therefore, . . . non-prime home market sales without product characteristics will not factor into the Department's analysis. The remaining . . . prime merchandise sales without certain product characteristics [is insignificant in terms of] the total home market prime merchandise sales quantity, which we respectfully submit is inconsequential to the Department's analysis.

PR 30/CR 12 at S2-1--S2-2.

In the preliminary determination, Commerce applied partial adverse facts available because ThyssenKrupp "had the opportunity to suggest reporting the missing characteristics in an alternative form, yet it failed to do so." 67 Fed. Reg. at 51203, PR 34. Commerce noted that the preceding administrative review involved a "similar situation" in which ThyssenKrupp did not initially report complete data for rolling process (hot or cold), gauge, finish, width, and temper for a number of home market sales but was able to remedy the missing characteristics either by calculating the average finish, gauge, and width from its packing list data or, eventually, by reporting the actual

transaction-specific information. *Id.* (citations omitted). Commerce considered ThyssenKrupp "a sophisticated company with experience in the procedures of an antidumping investigation and administrative review" and therefore deemed it appropriate, preliminarily, to apply partial adverse facts available.[9] *Id.* *See* 19 U.S.C. § 1677m(c).

By the final results, however, after considering the parties' case and rebuttal briefs Commerce decided to apply neutral facts available. PR 47. Similar to the situation of the preceding review, ThyssenKrupp suggested using average verified values as substitutes for the missing finish, gauge, width, temper, and hot/cold rolled data. Although ThyssenKrupp did not provide the calculations for its suggested alternative data, Commerce noted that it had, however, provided a computer program which would make such calculations. Commerce thus decided that the omission did not warrant an adverse inference and that ThyssenKrupp had acted to the best of its ability because it provided "the most precise data available from its accounting system" by "merging its product characteristics with NSC's electronic packing list[.]" Further, substituting average values for the missing finish, gauge, width, hot/cold rolled, and temper data "is consistent with the methodology utilized in the first review of this case." *Id.*

AK Steel relies on *Nippon Steel Corp. v. United States*, 337 F. 3d 1373 (Fed. Cir. 2003), to argue that Commerce incorrectly interpreted 19 U.S.C. § 1677e(b) in reaching its determination not to draw an adverse inference with respect to the missing data. Pl's Br. at 22. The appellate panel

---

[9] As partial adverse facts available, Commerce matched home market NSC sales missing product characteristics "to the lowest-priced product of the same grade sold in the United States by assigning the home market transaction the corresponding U.S. control number." 67 Fed. Reg. at 51204, PR 34. For any home market sales of grades not sold in the United States which had missing characteristics, the Department assigned to the product "the home market control number of the highest-priced product of the same grade in the home market." *Id.*

in *Nippon Steel* stated that an importer or respondent must "keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce[,]" 337 F.3d at 1382, and AK Steel stresses the panel's express statement that inadequate recordkeeping is not condoned.  Thus, AK Steel argues that the heart of the inquiry here is whether substantial record evidence supports a determination that ThyssenKrupp, an experienced, resourceful, and sophisticated respondent, did the maximum it could do to provide all requested information, particularly since it knew what information would be requested, having been called upon to produce it in the previous review.  AK Steel contends that Commerce's determination to permit ThyssenKrupp to report incomplete data, when the record shows that ThyssenKrupp was *not* "unable" to report all required product characteristics, is inconsistent with *Nippon Steel*'s instruction that a respondent put forth maximum effort in complying with Commerce's requests for information. Pl's Br. at 22.

The government and ThyssenKrupp respond that application of neutral facts available is supported by substantial evidence and is otherwise in accordance with law.  They argue that Commerce correctly determined that ThyssenKrupp had acted to the best of its ability by providing alternatives and explanation for the missing product characteristics, and that the determination is reasonable since it reflects the approach followed in the preceding review.  Def's Br. at 22; Def-Int's Br. at 27-28.

*Nippon Steel* was decided after Commerce reached its determination, but it stands for the proposition that section 1677e(b) does not inject a *mens rea* consideration into Commerce's discretion on whether to apply an adverse or neutral inference to a given set of facts.  Although the

term "may" in section 1677e(b) is clearly permissive, not mandatory, the Court of Appeals for the

Federal Circuit admonished that

> [a]n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made[,] *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown. While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statue does not contain an intent element. "Inadequate inquiries" may suffice. The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent.

337 F.3d at 1383.

In other words, the agency's discretion *may* be influenced, but it is not precluded, by a

respondent's inadvertence or unintentional mistake. Conversely, "a respondent satisfies the statutory

mandate to act to the best of its ability when the respondent does 'the maximum it is able to do' in

meeting Commerce's requests for information." *China Steel Corp. v. United States*, 28 CIT ___,

___, 306 F.Supp.2d 1291, 1303-04 (2004) (quoting *id*. at 1382). "[T]he purpose of section 1677e(b)

is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or

uncorroborated margins." *F.Lli De Cecco Di Filippo Fara S. Martino S.p. A. v. United States*, 216

F.3d 1027, 1032 (Fed. Cir. 2000). *See, e.g,, American Silicon Technologies v. United States*, 24 CIT

612, 626-27, 110 F.Supp.2d 992, 1003-04 (CIT 2000) (remand appropriate where Commerce

applied adverse inference without determining whether respondent had the ability to respond).

AK Steel apparently interprets *Nippon Steel* to require Commerce to prove that an importer

cooperated to the best of its ability every time that the agency decides *not* to apply adverse facts

available.[10] This runs counter to the discretion afforded to Commerce by section 1677e(b) in the application of adverse facts available. The Court concludes that Commerce's determination on this matter is consistent with *Nippon Steel*, and there is substantial evidence on the record from which to infer that ThyssenKrupp acted to the best of its ability in attempting to comply with requests for information.

As described above, in both its November 6, 2001, and its April 29, 2002 submissions ThyssenKrupp explained that it could not provide product characteristics for a small number of its affiliate NSC's home market sales because those sales were "non-prime merchandise" sold in "bundles" to customers such as scrap metal companies for whom product characteristics were unimportant and whose invoices did not list the product characteristics Commerce desired. PR 12/CR 2 at B-7--B-11; PR 22/CR 7 at B-3--B-4. ThyssenKrupp's first supplemental response explained that it had not been possible within the time provided for it or NSC to manually go through all the packing lists and obtain the missing information. PR 22/CR 7 at B-3--B-4. ThyssenKrupp's second supplemental response explained that it had attempted to comply with Commerce's request by merging data from NSC's electronic packing list, and personnel had manually reviewed over 3,000 invoices of another company in order to track down some of the missing product characteristic data, and ThyssenKrupp respectfully submitted that the prime merchandise sales which remained without complete product characteristics data represented a *de minimis* percentage of the total home market prime merchandise sales quantity which ought to be considered "inconsequential" for purposes of Commerce's analysis. PR 30/CR 12 at S2-1--S2-2. Following the preliminary

---

[10] *See* Pl. Br. at 23.

determination, ThyssenKrupp reiterated its position and provided alternatives to remedy the deficiency. PR 39/CR 18 at CB-18 ("most of the sales are non-prime and would not match to U.S. prime merchandise sales that account for [nearly all of the] sales of the subject merchandise" and the prime NSC sales account for a *de minimis* percentage of total home market sales).

In the *Final Results*, Commerce determined that ThyssenKrupp had retained reasonable records and acknowledged that ThyssenKrupp had "extend[ed] its attempt to remedy the [missing] physical characteristics[.]" Commerce noted that although ThyssenKrupp had not calculated averages for the *Preliminary Results*, it "fully explain[ed] the circumstances wherein product characteristics were missing, and provide[d] a computer program to attribute average product characteristics to those sales in which product characteristics were missing." PR 47 at 19. *See* PR 30/ CR 12 at Exhibits 1-5; PR 39/CR 18 (attachments to case brief providing alternative methodologies to fill the gap in product information). Since Commerce had previously accepted an alternative source of information for NSC's missing characteristics in the prior review, it was reasonable for Commerce to infer that ThyssenKrupp could reasonably expect that similar missing information in this period of review would not be an obstacle to the application of neutral, rather than adverse, facts available. *See* PR 47 at 19. Commerce's conclusion that ThyssenKrupp cooperated to the best of its ability is reasonable, not an abuse of discretion, and supported by substantial evidence. The Court may not substitute a different view of the matter.[11] *See Consolo*, *supra*, 383 U.S. at 620.

---

[11] The government also points out that it appears to be inconsistent for AK Steel to argue for "administrative regularity" regarding the deduction of indirect selling expenses while asserting, essentially, "that Commerce must change course and apply adverse facts" despite the application of neutral facts under similar circumstances in the prior period of review. *See* Def's Br. at 22-23.

### *Conclusion*

For the foregoing reasons, judgment will enter for the defendant.


                                                    /s/  R. Kenton Musgrave
                                                    R. KENTON MUSGRAVE, JUDGE


Dated: August 25, 2004
          New York, New York