**Slip Op. 99-112**

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |
|---|---|
| POHANG IRON AND STEEL CO., LTD., POHANG COATED STEEL CO., LTD., AND POHANG STEEL INDUSTRIES CO., LTD., Plaintiffs, | : : : : : |
| v. | : |
| THE UNITED STATES, Defendant, | : : : |
| and | : |
| NATIONAL STEEL CORPORATION; U.S. STEEL GROUP - A UNIT OF USX CORPORATION; INLAND STEEL INDUSTRIES, INC.; BETHLEHEM STEEL CORPORATION; AND LTV STEEL CO., INC., Defendant-Intervenors. | : : : : : : |

Consol. Court No. 98-04-00906

Public Version

_____

NATIONAL STEEL CORPORATION, <u>et al.</u>,
            Plaintiffs,

            v.

THE UNITED STATES,
            Defendant,

            and

POHANG IRON AND STEEL CO., LTD.,
<u>et. al</u>.,
            Defendant-Intervenors,

            and

UNION STEEL MANUFACTURING CO., LTD.,
            Defendant-Intervenor.

_____

[ITA determination remanded.]

Dated:  October 20, 1999

Akin, Gump, Straus, Hauer & Feld, L.L.P. (Sukhan Kim, Spencer S. Griffith, and Samuel C. Straight) attorneys for the POSCO Group.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michele D. Lynch), Bernd G. Janzen, Office of the Chief Counsel for Import Administration, Department of Commerce, of counsel, for defendant.

Dewey Ballantine LLP (Michael H. Stein, Bradford L. Ward, Jennifer Danner Riccardi, Dominic L. Bianchi, and Andrew J. Conrad) for National Steel Corporation, et al.

Kaye, Scholer, Fierman, Hays & Handler, LLP (Donald B. Cameron, Julie C. Mendoza, and John P. Healy) for defendant-intervenor Union Steel Manufacturing Co., Ltd.

## OPINION

**RESTANI, Judge:**  This matter is before the court on Cross-Motions for Judgment Upon the Agency Record, pursuant to USCIT Rule 56.2, brought by foreign producers Pohang Iron and Steel Co., Ltd ("POSCO"), Pohang Coated Steel Co., Ltd. ("POCOS"), and Pohang Steel Industries Co., Ltd. ("PSI") (collectively "POSCO Group"), and National Steel Corporation; U.S. Steel Group, A Unit of USX Corp.; Inland Steel Industries, Inc.; Bethlehem Steel Corporation; and LTV Steel Co., Inc. (collectively "Domestic Producers").  Union Steel Manufacturing Co., Ltd. ("Union") appears as defendant-intervenor on Domestic Producer's motion.[1]

_____

[1]     Defendant-intervenor Dongbu Steel Co., Ltd. did not
                                              (continued...)

Under review are the results of Commerce's third administrative review of the antidumping order in <u>Certain Cold-Rolled Carbon Steel Flat Products and Certain Corrosion-Resistant Carbon Steel Flat Products from Korea</u>, 58 Fed. Reg. 44,159 (Dep't Commerce 1993) (final less than fair value determination). <u>Certain Cold-Rolled and Corrosion Resistant Carbon Steel Flat Products From Korea</u>, 63 Fed. Reg. 13,170 (Dep't Commerce 1998) [hereinafter "<u>Final Results</u>"], and Amended Final Results, <u>Certain Cold-Rolled Carbon Steel Flat Products from Korea; Certain Corrosion-Resistant Carbon Steel Flat Products From Korea</u>, 63 Fed. Reg. 20,572 (Dep't Commerce 1998) [hereinafter "<u>Amended Final Results</u>"]. The third administrative review covers the period from August 1, 1995 through July 31, 1996.

In order to compute a dumping margin for purposes of imposing an antidumping duty, Commerce compares United States Price to Normal Value (or "NV"). 19 U.S.C. § 1673 (1994). If Normal Value on average exceeds United States Price, duties are imposed. Normal Value is preferably based on home market prices. 19 U.S.C. § 1677b (1994). Where home market prices are unavailable for use, either third country price or

---

[1](...continued)
submit a memorandum before the court.

constructed value ("CV") (based on cost of production) is used.  See 19 U.S.C. § 1677b(a)(1)(C);(a)(4).  CV may also be used where substantial amounts of sales are below the cost of production.  19 U.S.C. § 1677b(b)(1).  This matter involves a number of cost of production issues as well as issues involving choice of the basic methodology for calculating U.S. price and price adjustments.

## Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994).  In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations which are unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B) (1994).

## I. Steel Substrate Transfer

## Background

In this review, as in prior reviews of the same determination, Commerce "collapsed" POSCO, POCOS, and PSI into the "POSCO Group," treating them as one entity for purposes of its antidumping analysis.  Final Results, 63 Fed. Reg. at 13,185.  Consistent with its findings in the second review, Commerce determined for its cost calculations that hot-rolled steel substrate transferred from POSCO to POCOS, i.e., within

the POSCO Group, should not be revalued pursuant to 19 U.S.C.

§§ 1677b(f)(2) and (3), the "fair value" and "major input"

provisions of the antidumping statute.[2]  Commerce instead

valued the substrate at the weighted-average POSCO Group-wide

cost of production.  Final Results, 63 Fed. Reg. at 13,185.

In the Final Results, Commerce concluded that:

> [B]ecause we are treating these companies as one
> entity for our analysis, intra-company transactions
> should be disregarded . . . . [T]he decision to
> treat affiliated parties as a single entity
> necessitates that transactions among the parties
> also be valued based on the group as a whole and, as
> such, among collapsed entities the fair-value and
> major-input provisions are not controlling.

63 Fed. Reg. at 13,185.

Domestic Producers maintain that POSCO and POCOS should

be treated not as part of a collapsed entity but as affiliated

parties under 19 U.S.C. § 1677b(f), which requires application

of the major input rule and the fair value provision to inputs

transferred between "affiliated persons."  Under the

statute, any person who owns "five percent or more of the

outstanding voting stock or shares of any organization . . .

---

[2]     The "fair value" and "major input" provisions of the
antidumping statute specify conditions under which
transactions between affiliates can be disregarded for cost
calculation purposes.  See 19 U.S.C. §§ 1677b(f)(2)-(3).
Application of these sections of the statute would have
required Commerce to treat each member of the collapsed POSCO
group as an individual entity for the purpose of calculating
substrate costs.

shall be considered to be 'affiliated.'" 19 U.S.C. §

1677(33)(E) (1994). POSCO owns fifty percent of POCOS. See

POSCO's Section A Response (Oct. 25, 1996), at 5, C.R. Doc. 3,

Def.'s App., Ex. 1, at 2. Domestic Producers therefore

contend that the statutory requirement for affiliation is

satisfied.

## Discussion

The court has determined previously on essentially the

same facts that POSCO and POSCOS may be treated as a single

entity. AK Steel Corp. v. United States, 34 F. Supp.2d 756,

764-65 (Ct. Int'l Trade 1998). The court has also held that

single entity treatment is inconsistent with application of

the fair value and major input provisions. Id. at 766. As

these issues are discussed in detail in AK Steel and the

Domestic Producers have raised no arguments which cast the

holdings of AK Steel on these issues in doubt, the court

adopts the reasoning of AK Steel and sustains the

determination of the Department of Commerce not to apply the

fair value or major input provisions of 19 U.S.C. § 1677(f)(2)

and (3).

## II. Startup Costs

### Background

Commerce asked the POSCO Group to explain whether it "was engaged in any start up production operations for the merchandise under review during the cost calculation period." Questionnaire (Sept. 19, 1996), at D-9, P.R. Doc. 7, Def.'s App., Ex. 4, at 7. The Department asked the POSCO Group to describe any such operation and provide total costs attributable to the operation, monthly production data, and all dates relevant to the construction and initiation of production of such operation. Id.

The POSCO Group reported to Commerce that in June 1995, it had begun construction of a new line in its existing plant.[3] See POSCO Supplemental Section D Response (Mar. 3, 1997), at 31, C.R. Doc. 19, Def.'s App., Ex. 6, at 4. POSCO had finished installing the necessary production equipment one year later, in April 1996, and had commenced initial commercial production at that time. Id. The new line significantly increased POSCO's capacity to produce certain

---

[3]    POSCO's plant is located in [    ], Republic of Korea. The new line is one of [    ] at the [    ] plant involved in the manufacturing of [    ] products. The [    ] products into an entirely different product, [    ], a corrosion-resistant product. POSCO Br. at 35 n.22; see also POSCO Section D Questionnaire Response (Nov. 18, 1996), at D-9-10, C.R. Doc. 7, POSCO App., Tab 3, at 2-3.

products.[4]  See POSCO Case Brief (Oct. 15, 1997), at 30, C.R.

Doc. 57, POSCO App., Tab 11, at 5.

The POSCO Group maintained that "production levels were

limited by technical factors associated with the initial phase

of commercial production," and that as a result, "POSCO

experienced abnormally high costs[5] for output from this line."

POSCO Section D Questionnaire Response, at D-35, Def.'s App.,

Ex. 5, at 5.  POSCO argued that Commerce should "reduce

POSCO's reported costs by the amount of the requested startup

adjustment for extraordinary costs associated with the startup

phase of a facility."  Final Results, 63 Fed. Reg. at 13,199.

Commerce examined the POSCO Group's startup adjustment

claim during verification and denied the request determining

that "such an adjustment is unwarranted."  POSCO Preliminary

Analysis Memorandum (Sept. 2, 1997), at 7, P.R. Doc. 116,

Def.'s App., Ex. 3, at 2.  Although the POSCO Group objected,

the Department again denied POSCO's request in the Final

Results, as not meeting the criteria for a startup adjustment

pursuant to 19 U.S.C. § 1677b(f)(1)(C)(ii).  Final Results, 63

---

    [4]    POSCO's capacity to produce [    ] products was
increased by [   ] percent.  POSCO Case Brief (Oct. 15, 1997),
at 30, C.R. Doc. 30, POSCO App., Tab 11, at 5.

    [5]    Pohang incurred total costs of [    ] won to operate
this facility.  POSCO Supplemental Section D Response, at 30,
POSCO App., Tab 7, at 3.

Fed. Reg. at 13,200.  Specifically, Commerce concluded that

the new line did not constitute a "new production facility" or

"the substantially complete retooling of an existing plant"

for purposes of 19 U.S.C. § 1677b(f)(1)(C)(ii)(I), and that

production levels were not shown to have been limited by

"technical factors," as required by 19 U.S.C. §

1677b(f)(1)(C)(ii)(II).  Final Results, 63 Fed. Reg. at

13,200-01.

The POSCO Group asserts that the Department incorrectly

relied on the fact that the new line did not produce "new

products" simply because POSCO also made the product on other

existing lines.  POSCO claims it constructed a "new production

facility," regardless of whether the new facility produces

products that POSCO produces at other facilities.  Finally,

POSCO contends that production was in fact limited due to

technical factors associated with startup operations.[6]

---

[6]    Specifically, the POSCO Group argues that because
the line was new and involved "production of a different range
of products," increased monitoring and various tests were
required to ensure the products met quality and safety
standards.  POSCO Br. at 38.  As a result, POSCO alleges, the
new line operated below its production capacity during the
period of review ("POR").

### Discussion

The POSCO Group contends that Commerce's denial of a startup adjustment is unsupported by substantial evidence and not in accordance with law because POSCO allegedly satisfied the statutory requirements for a startup adjustment. Commerce is required to make an adjustment for startup operations where:

> (I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and

> (II) production levels are limited by technical factors associated with the initial phase of commercial production.

19 U.S.C. 1677b(f)(1)(C)(ii). After reviewing the POSCO Group's database and product brochure, Commerce concluded that POSCO "manufactured products such as those produced from the new equipment prior to its installation." Final Results, 63 Fed. Reg. at 13,200. The Department also found that the product range of the new line was similar to that of POSCO's other lines with respect to certain dimensions. Id. The court affirms Commerce's decision because the POSCO Group failed to satisfy the statutory requirements.

The POSCO Group concedes that the new line was not involved in the production of a different product. See POSCO Br. at 36 ("the Department incorrectly relied on the fact that

the new line did not produce 'new products.'")(emphasis

added).  POSCO contends, however, that in this case Commerce

need not consider whether the product is "new and different,"

but rather should consider whether the production facility is

new.  As the statute permits the adjustment for either a new

production facility or a new product, even if the new line

does not produce a new product, POSCO may be entitled to the

adjustment if the new line constitutes a "new production

facility."  Commerce determined that it does not.  <u>Final</u>

<u>Results</u>, 63 Fed. Reg. at 13,200.

     POSCO challenges Commerce's interpretation of these

terms. The court therefore considers whether Commerce's

understanding of the statutory reference to "new product" as

meaning a <u>different</u> product from those otherwise produced by

the respondent and of "new production facility" as excluding a

new production line within an existing plant reflects a

permissible reading of the statute.

     The court reviews an agency's construction of its

statutory mandate according to the two-step test established

by <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council</u>,

467 U.S. 837, 842-43 (1984).  The court asks first "whether

Congress has directly spoken to the precise question at

issue."  <u>Chevron</u>, at 842.  If the intent of Congress is clear,

the court and agency must defer to Congress.  Id. at 843.  If

Congress' intent is ambiguous, the court must determine

whether the "agency's answer is based on a permissible

construction of the statute."  Id.

The statute is silent as to the definitions of "new

product" and "new production facility."  See 19 U.S.C. §

1677b(f)(C)(ii)(I).  Although Congress did not elaborate on

the terms "new product" or "new production facilities" in 19

U.S.C. § 1677b(f)(C)(ii)(I), the Statement of Administrative

Action of the Uruguay Round Agreements Act does address the

question.  Statement of Administrative Action, accompanying

H.R. 103-5110 at 656 (1994), reprinted in 1994 U.S.C.C.A.N.

3773, 4040 ("SAA").[7]  The SAA states:

> Mere improvements to existing products or
> ongoing improvements to existing facilities will not
> qualify for a startup adjustment.  Commerce also
> will not consider an expansion of the capacity of an
> existing production line to be a startup operation
> unless the expansion constitutes such a major
> undertaking that it requires the construction of a
> new facility and results in a depression of
> production levels due to technical factors
> associated with the initial phase of commercial
> production of the expanded facilities.

_____

[7]    The SAA represents "an authoritative expression by
the Administration concerning its views regarding the
interpretation and application of the Uruguay Round Agreements
... The Administration understands that it is the expectation
of the Congress that future Administrations will observe and
apply the interpretations and commitments set out in this
statement."  SAA, at 1, 1994 U.S.C.C.A.N. at 4040.

"New production facilities" includes the substantially complete retooling of an existing plant.  Substantially complete retooling involves the replacement of nearly all production machinery or the equivalent rebuilding of existing machinery.

SAA, at 166, 1994 U.S.C.C.A.N. at 4173.  Commerce's interpretation of the statute is reasonable and consistent with Congressional intent as reflected in the SAA.  Commerce is not unreasonable in concluding that in providing for a startup cost adjustment in certain cases, the statute contemplated instances of the production of a <u>different</u> product from those previously produced or the more elaborate establishment of a new facility than even the addition of an expensive new line within an existing plant.

According to the statute, if POSCO does not show that the new line produces a new product, POSCO must show that the new line constitutes a "new production facility," and POSCO has not provided evidence in support of that position.  Nothing in the record suggests that the new line is anything but an expansion of POSCO's existing type of production.[8]  The new line was established as part of POSCO's existing factory and increased POSCO's overall capacity to produce certain products already in production, as it performed functions that were the

---

[8]     Whether the line is in the same building or a different one is not determinative.

same or similar to those of other lines at the plant.  See

POSCO Section D Questionnaire Response, at D-10, Def.'s App.,

Ex. 5, at 3.  Moreover, POSCO points to no evidence that a

"substantial retooling" of the plant took place; the POSCO

Group does not contend that "nearly all" production machinery

was either replaced or rebuilt.

The POSCO Group's argument depends solely on the fact

that it expended substantial effort and investment in creating

the new line.[9]  See POSCO Br. at 35-37.  That POSCO incurred

what it calls "considerable costs" in establishing the new

line is unremarkable without a showing that the sizeable

investment was geared toward the production of a new product

or a new production facility.

In light of the legislative history, the court finds

Commerce's construction of 19 U.S.C. § 1677b(f)(1)(C)(ii)(I)

reasonable.  The POSCO Group has not satisfied the

requirements of the statute as reasonably interpreted by

---

[9]    POSCO's investment in the new line equaled [    ]
percent of total value from its property, plant, and
equipment.  POSCO Rebuttal Brief (Oct. 22, 1997), at 11, C.R.
Doc. 47, Def.'s App., Ex. 8, at 2.

Commerce.[10]  Accordingly, Commerce's decision on this issue is affirmed.

## III. Constructed Export Price

### Background

In the Preliminary Results, for the purposes of calculating U.S. price, Commerce classified all POSCO Group U.S. sales during the POR as export price ("EP") sales (i.e. sales for export to the United States made to a party not affiliated with the producer or exporter).[11]  See Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea, 62 Fed. Reg. 47,422, 47,425 (Dep't Commerce 1997) (preliminary results of antidumping duty admin. rev.)

---

[10]    To qualify for a startup adjustment, a respondent must satisfy the requirements in subsections 1677b(f)(1)(C)(ii)(I) and (II) of the antidumping statute. See 19 U.S.C. § 1677b(f)(1)(C)(ii).  Because the POSCO Group failed to qualify according to the requirements of subsection (I), the court need not determine whether Commerce properly concluded that production levels were not limited by technical factors, pursuant to 19 U.S.C. § 1677b(f)(1)(C)(ii)(II).

[11]    The statute defines export price as:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.

19 U.S.C. § 1677a(a) (1994).

[hereinafter "Preliminary Results"].  After examining the

functions of POCOS' and POSCO's U.S. sales affiliates,

however, Commerce determined that most of these sales should

be reclassified as constructed export price ("CEP") sales

(i.e. sales for export to the United States made to an

affiliate of the producer or exporter).[12]  See Final Results,

63 Fed. Reg. at 13,172, 13,182-83.

In its response to Commerce's questionnaire, the POSCO

Group provided an overview of its U.S. sales processes for

POCOS and POSCO. See POSCO Questionnaire Response (Oct. 25,

1996), at 23-24, C.R. Doc. 3, Def.'s App., Ex. 1, at 4-5.

With respect to POCOS, the POSCO Group explained that all of

POCOS' sales to the United States during the POR were made

through ABC,[13] an affiliate of DEF.[14]  See id. at 23, Def.'s

App., Ex. 1, at 4.  Acting as a trading company, ABC sells

---

[12]    The statute defines constructed export price as:

> the price at which the subject merchandise is first sold
> (or agreed to be sold) in the United States before or
> after the date of importation by or for the account of
> the producer or exporter of such merchandise or by a
> seller affiliated with the producer or exporter, to a
> purchaser not affiliated with the producer or exporter.

19 U.S.C. § 1677a(b).

[13]    "ABC" refers to [    ].  Commerce's public documents
refer to it as "AKO."

[14]    "DEF" refers to [    ].

POCOS products to GHI,[15] a trading company affiliated with ABC. See id. Although GHI resells the product to the U.S. customer, it does not take possession of the goods, hold any inventory, or have independent sales authority. See id. GHI takes title and acts as importer of record, but merchandise is shipped directly from the mill in Korea to the customer. See id. at 24, Def.'s App., Ex. 1, at 5. Typically, the U.S. customer contacts GHI with its purchase order, which GHI then forwards to POCOS. See POSCO Section A Questionnaire Response (Oct. 25, 1996), at 48, C.R. Doc. 4, POSCO App., Tab 1, at 16. Although POCOS provides GHI with quarterly base price lists, customers provide GHI with a price quotation, which GHI then forwards to POCOS for confirmation. See id. GHI collects payment from the customers, and pays for U.S. brokerage and handling costs for POCOS' U.S. sales. See POSCO Supplemental Section C Response (Mar. 3, 1997), at 25, C.R. Doc. 25, POSCO App., Tab 6, at 6. Although POCOS is responsible for procuring the duty drawback, POSCO Section C Questionnaire Response (Nov. 18, 1996), at 51, C.R. Doc. 9, POSCO App., Tab 2, at 5, GHI arranges and pays for marine insurance,[16] POSCO

_____

[15]    "GHI" refers to [    ]. Commerce's public documents refer to it as "BUS."

[16]    GHI also [    ]. POSCO Supplemental Section C
                                                    (continued...)

Section A Questionnaire Response, at 39, POSCO App., Tab 1, at 13.

POSCO made all sales during the POR either through a wholly-owned trading company, POSTRADE, or directly to POSAM, another wholly-owned trading company.[17] See POSCO Section A Questionnaire Response, at 20-21, POSCO App., Tab 1, at 3-4. POSAM takes title to POSCO's products and acts as importer of record. See id. POSAM does not take possession of the goods, as products are shipped directly from POSCO to the U.S. customer, and maintains no inventory of POSCO's products. See id. at 21, POSCO App., Tab 1, at 4. U.S. customers send inquiries to POSAM, which then prepares an order confirmation sheet and submits it to POSCO for approval. See POSCO Home Market Verification Report (June 27, 1997), at 8, C.R. Doc. 37, POSCO App., Tab 8, at 8. If the customer does not provide a price in its initial inquiry, POSAM may suggest a price based on quarterly price lists provided to POSAM by POSCO. See id. In the case of a new U.S. customer, terms of sale may

---

[16](...continued) Questionnaire Response, at 25, POSCO App., Tab 6, at 6.

[17]     From the third quarter of 1995 through the end of the POR, POSCO sold directly to POSAM, before which products had first been sold to POSTRADE and then to POSAM. See POSCO Section A Questionnaire Response, at 20-21, POSCO App., Tab 1, at 3-4.

be negotiated directly with POSCO.  See id. at 5-6, POSCO

App., Tab 8, at 5-6.  POSAM is not authorized to negotiate

terms of sale with the customers nor change the terms of sale

established by POSCO with the customers.  See id.; POSCO

Supplemental Section A Response (Feb. 18, 1997), at 19, C.R.

Doc. 22, POSCO App., Tab 5, at 4.  Once the order is confirmed

by POSCO, POSAM is responsible for collecting payments from

customers.  See POSCO Section A Questionnaire Response, at 37,

POSCO App., Tab 1, at 11.  POSCO is responsible for securing

the duty drawback, POSCO Section C Questionnaire Response, at

51, POSCO App., Tab 2, at 5, although POSAM arranges and pays

for Customs clearance and brokerage and handling,[18] POSCO

Section A Questionnaire Response, at 36-37, POSCO App., Tab 1,

at 10-11.

## Discussion

In this administrative review, Commerce utilized its

three-part test, developed in response to this court's

decision in PQ Corp. v. United States, 11 CIT 53, 58-65, 652

F. Supp. 724, 729-35 (1987), to determine whether sales made

by POSCO through its U.S. affiliates should be classified as

EP sales or CEP sales.  Application of the test requires that

---

[18]    POSAM is also responsible for handling [    ].  POSCO
Section A Questionnaire Response, at 38, POSCO App., Tab 1, at
12.

the following criteria be established in order for such sales

to receive EP classification:

> (1) whether the merchandise was shipped directly
> from the manufacturer . . . to the unaffiliated U.S.
> customer;
>
> (2) whether this was the customary commercial
> channel between the parties involved; and
>
> (3) whether the functions of the U.S. sales
> affiliates . . . were limited to those of processors
> of sales-related documentation and communications
> links with unrelated U.S. buyers.

Final Results, 63 Fed. Reg. at 13,182.  As Commerce noted,

Domestic Producers do not contest that POSCO satisfied the

first two criteria.  See id.  "Consequently, the third

criterion, pertaining to the level of affiliate involvement in

making sales or providing customer support, is the determining

factor in this instance."  Id.

Although Commerce had initially determined that the POSCO

Groups satisfied all three criteria and that its sales

therefore warranted EP classification, see Preliminary

Results, 62 Fed. Reg. at 47,425-26, the agency concluded in

its final determination that the sales made by POSCO and POCOS

through their respective affiliates, POSAM and GHI, warranted

CEP classification because the third criterion was not

satisfied, see Final Results, 63 Fed. Reg. at 13,183.  The

POSCO Group argues that this classification is not supported

by substantial evidence because the facts in this case are the same as in the second administrative review, in which Commerce classified its sales as EP transactions.  In addition, it argues, the factors identified by Commerce and Domestic Producers have previously been upheld by this court to support an EP classification, and therefore, cannot substantiate a CEP classification in this case.  Commerce and Domestic Producers argue that the CEP classification must be upheld because of the significant involvement of the U.S. affiliates in POSCO's and POCOS' U.S. sales during the period of review, particularly the level of the affiliates' participation in contacting customers and setting prices for the U.S. market. Domestic Producers also emphasize that despite this court's upholding of an EP classification in previous cases that included many of the same factors, Commerce has the authority to reweigh those factors in each case so as to arrive at a different conclusion during a different period of review.

The POSCO Group is certainly correct that this court has previously upheld EP (formerly known as "purchase price," or PP) classification for the U.S. sales of foreign producers who followed practices similar to those maintained by POSCO, POCOS, and their U.S. affiliates in this record. Specifically, this court has found EP (or PP) classification

to be supported by substantial evidence when the U.S.

affiliate has performed the following functions, all of which

have also been performed by POSAM and/or GHI in this case:

- taking title from the foreign producer, see AK Steel

  Corp., 34 F. Supp.2d at 759-60, 762; Zenith Elecs. Corp.

  v. United States, 18 CIT 870, 874-75 (1994); Outokumpu

  Copper Rolled Prods. AB v. United States, 17 CIT 848,

  857, 829 F. Supp. 1371, 1379 (1993);

- functioning as the importer of record, see AK Steel, 34

  F. Supp.2d at 759-60, 762; Independent Radionic Workers

  of Am. v. United States, 19 CIT 375, 375-76 (1995);

  Zenith, 18 CIT at 874-75; E.I. DuPont de Nemours & Co.,

  Inc. v. United States, 17 CIT 1266, 1281, 841 F. Supp.

  1237, 1249 (1993); Outokumpu, 17 CIT at 857, 829 F. Supp.

  at 1379;

- arranging and paying for insurance, see AK Steel, 34 F.

  Supp.2d at 759, 762;

- paying for inland freight to the U.S. customer, see AK

  Steel, 34 F. Supp.2d at 759-60, 762; Independent Radionic

  Workers, 19 CIT at 375-76;

- invoicing the U.S. customer directly, see AK Steel, 34 F.

  Supp.2d at 759-60, 762; Independent Radionic Workers, 19

CIT at 375-76; <u>Zenith</u>, 18 CIT at 874-75; <u>E.I. DuPont</u>, 17 CIT at 1281, 841 F. Supp. at 1249;

- serving as a point of contact for the U.S. customer, <u>see</u> <u>AK Steel</u>, 34 F. Supp.2d at 759-60, 762; <u>E.I. DuPont</u>, 17 CIT at 1281, 841 F. Supp. at 1249; <u>Outokumpu</u>, 17 CIT at 858, 829 F. Supp. at 1379; and

- collecting payment directly from the U.S. customer, <u>see</u> <u>AK Steel</u>, 34 F. Supp.2d at 759-60, 762; <u>Independent</u> <u>Radionic Workers</u>, 19 CIT at 375-76; <u>Zenith</u>, 18 CIT at 874-75; <u>E.I. DuPont</u>, 17 CIT at 1281, 841 F. Supp. at 1249.[19]

Contrary to POSCO's contentions, however, the aforementioned cases do not stand for the proposition that Commerce may only classify a foreign producer's sales to its U.S. affiliate as CEP sales when factors other than those identified above are present.

In arguing that the holdings of these previous cases mandate a rejection of Commerce's CEP classification in this case, the POSCO Group misunderstands the substantial evidence standard of review employed by this court when reviewing Commerce's determinations.  As the Supreme Court has stated,

---

[19]    Also, [    ]. <u>See</u> <u>Outokumpu</u>, 17 CIT at 857, 829 F. Supp. at 1379.

substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).  See also Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB, 975 F.2d 807, 814 (Fed. Cir. 1992) (CIT's finding of substantial evidence to support ITC's determination did not prevent ITC from permissibly reaching contrary determination upon remand).  Cf. Timken Co. v. United States, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), aff'd 894 F.2d 385 (Fed. Cir. 1990) ("It is not within the court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record.") (citation omitted).  That the court previously has found the described factors insufficient to warrant a CEP classification, therefore, does not prevent Commerce from concluding in another case, supported by substantial evidence, that a different interaction of the same factors warrants a CEP classification.

More telling than the factors upheld by this court in previous cases as indicative of an EP classification is

Commerce's classification of POSCO's sales to their U.S.

affiliates in the prior administrative review, upheld by this

court in AK Steel, 34 F. Supp.2d at 762.  Whereas Commerce

classified those sales as EP transactions during the second

administrative review and, in fact, during the first

administrative review as well, Commerce altered those

conclusions in labeling the sales as CEP transactions during

this third administrative review.[20]  This court has recognized

that "Commerce has the flexibility to change its position[,]

providing that it explains the basis for its change and

providing that the explanation is in accordance with law and

supported by substantial evidence." Cultivos Miramonte S.A.

v. United States, 980 F. Supp. 1268, 1274 (Ct. Int'l Trade

1997).  Commerce offers three bases to justify its change in

classification during the third administrative review:    (1)

"U.S. affiliates . . . played a central role in the sales

activities after the merchandise arrived in the United

States"; (2) "U.S. customers seldom had contact with POSCO or

POCOS"; and (3) U.S. affiliates were significantly involved in

the setting of prices for U.S. customers. Final Results, 63

Fed. Reg. at 13,183.

---

[20]    Commerce's attempt to reconsider its final EP
decision in the second review was rebuffed by the court. AK
Steel, 34 F. Supp.2d at 762.

With regard to the first observation, Commerce has failed to provide a reasoned explanation as to the "central role" played by the U.S. affiliates in this case.  See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 374-77 (1998) ("process by which [agency] reaches [its] result must be logical and rational").  In the Final Results Commerce noted the existence of factors similar to those found in German Plate.[21]  In German Plate a CEP classification was upheld by this court in U.S. Steel Group - A Unit of USX Corp. v. United States, 15 F. Supp.2d 892, 902-03 (Ct. Int'l Trade 1998).[22] Based on the mere existence of similar factors, Commerce summarily concludes that POSAM and GHI play such a significant role that their sales do not qualify for EP classification. Commerce does not explain exactly how these "similar" factors in the context of this factual scenario establish a "central role" played by the U.S. affiliates.  Furthermore, Commerce points to no changed circumstances since the prior administrative review or any other reason that would warrant the new CEP classification.  Cf. Cultivos Miramonte, 980 F.

---

[21]     Certain Cut-to-Length Carbon Steel Plate from Germany, 62 Fed. Reg. 18,390 (Dep't Commerce 1997) (final results of antidumping duty admin. rev.).

[22]     The court also distinguished the facts of U.S. Steel from those present in POSCO's second administrative review. See AK Steel, 34 F. Supp.2d at 762.

Supp. at 1275 (concluding that Commerce's different determination upon the same set of facts may be justified if prior determination had been based on error).

Commerce may change the standards it applies to a given set of facts, but it must explain any departure from established standards. See Graphic Communications Int'l Union, Local 554 v. Salem-Gravure Div. of World Color Press, Inc., 843 F.2d 1490, 1493 (D.C. Cir. 1988) ("Agency decisions that depart from established precedent without a reasoned explanation will be vacated as arbitrary and capricious."). If Commerce's conclusion rests on factors, either legal or factual, that were not applicable to the prior reviews, those factors must be identified in a reasoned explanation rather than with the mere "conclusory statements" provided in the Final Results. See Graphic Communications, 843 F.2d at 1494.

Commerce next relies on the lack of direct contact between U.S. customers and the foreign manufacturers to establish that POSAM and GHI, rather than POSCO and POCOS, are the actual sellers in the U.S. market, thereby justifying the CEP classification. Commerce notes, in particular, the relevance of POSAM's and GHI's signing of the sales contracts as a relevant factor in its determination. See Final Results, 63 Fed. Reg. at 13,183. Again, however, Commerce fails to

provide an explanation for the change in classification from the second administrative review to the third review, including whether the signing of sales contracts by POSAM and GHI was a factor not present or overlooked during the second review.  That the U.S. affiliates in this case served as the outlets through which U.S. sales were made for POSCO and POCOS, and were the initial and predominant source of contact for U.S. customers, was well-established in the second administrative review.  See AK Steel, 34 F. Supp.2d at 759-60; Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea, 62 Fed. Reg. 18,404, 18,432-33 (Dep't Commerce 1997) (final results of antidumping duty admin. rev.) [hereinafter "Second Review"].  If Commerce relied on additional facts in the present record, not existent or considered during the second review, which warrant a reweighing of the evidence so that the foreign manufacturers' sales may be reclassified as CEP transactions, it must state such additional facts and provide a rational connection between those facts and its conclusions.  Cf. Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (Under the more deferential arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation

for its action including a 'rational connection between the facts found and the choice made.'") (quoting <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)).  In the absence of any explanation, however, Commerce's CEP classification cannot be justified by a mere restatement of a factor not erroneously considered, such as lack of customer contact, that had existed in the prior review, during which the U.S. sales were classified as EP transactions.

Finally, Commerce relies most heavily on the involvement of the U.S. affiliates in setting prices for the U.S. customers of POSCO and POCOS.  Contrary to the two other justifications proffered by Commerce for its CEP classification in this review, Commerce did explain in the <u>Final Results</u> that the more active role played by POSAM and GHI in setting U.S. prices, when compared to that in the second review, warranted CEP classification.  In particular, Commerce and Domestic Producers rely on three pieces of evidence to support Commerce's explanation:[23] (1) POSCO's and

---

[23]    Domestic Producers also point to an additional factor, not previously considered by the court's case law on this issue, in support of their argument that POSAM and GHI are more than "processors of sales-related documentation and communications links with unrelated U.S. buyers": they claim that POSAM and GHI finance the sales of POSCO's and POCOS' products to their U.S. customers.  <u>See</u> Domestic Producers Br. at 9-10, 13.  An examination of the record, including the

(continued...)

POCOS' inability to provide "tangible evidence of price

rejection by POSCO or POCOS"; (2) handwritten entries in

POSAM's cost spreadsheets; and (3) the substantial SG&A

expenses incurred by the U.S. affiliates in their U.S. sales

of POSCO's and POCOS' products.  Final Results, 63 Fed. Reg.

at 13,183.  Despite superficially satisfying the requirement

of a reasoned explanation, however, Commerce's factual base

for its decision, that POSAM and GHI were intimately involved

in the negotiation of U.S. prices, is unsupported by

substantial evidence.

"When [an agency] purports to be engaged in simple fact-

finding, unconstrained by substantive presumptions or

evidentiary rules of exclusion, it is not free to prescribe

what inferences from the evidence it will accept and reject,

but must draw all those inferences that the evidence fairly

---

[23](...continued)
specific portions cited by Domestic Producers, however,
reveals that their claim is not substantiated; Domestic
Producers' own unclear citations refer to documents unrelated
to the possible financing of purchases by U.S. customers.
Even if such evidence existed, however, this court could not
rule on whether that factor alone would render Commerce's
determination supported by substantial evidence because
Commerce itself did not identify that factor as relevant to
its determination in the Final Results.  See SEC v. Chenery
Corp., 318 U.S. 80, 95 (1943) ("administrative order cannot be
upheld unless the grounds upon which the agency acted in
exercising its powers were those upon which its action can be
sustained.").

demands."  Allentown Mack, 522 U.S. at 378 (rejecting NLRB's

systematic under- valuation of certain type of evidence)

(emphasis added).  The inference drawn from the evidence cited

by Commerce and Domestic Producers in this case must therefore

be reasonable and consistent with the evidence available in

the entire record.  First, with regard to the lack of evidence

establishing price rejection by POSCO and POCOS, Commerce

justifies its inference by claiming that "[n]either POCOS nor

POSCO has offered an explanation for the uncanny ability of

U.S. customers, given the absence of published price lists, to

suggest prices that appear always to be accepted by [POSCO and

POCOS]."  Gov't Br. at 33.  In doing so, however, Commerce

inadequately considered that POSCO did indeed offer such an

explanation during the California verification: "the company

did not indicate that it possessed . . . information [about

price rejection], and indicated that rejections would be

unusual, given the small number of U.S. customers, the minimal

numbers of sales to those customers, and the customers'

knowledge about POCOS' pricing."  POSCO U.S. Sales

Verification Report (Sept. 6, 1997), at 3, C.R. Doc. 51, POSCO

App., Tab 10, at 3.

    Second, Commerce notes that the "markup value" cell in

POSAM's cost spreadsheets was entered by hand rather than

based on a formula, from which it concludes, "a possible interpretation would be that the affiliate does in fact have some input into the magnitude of the markup it earns on the sales." Final Results, 63 Fed. Reg. at 13,183 (emphasis added). While this may well be a "possible interpretation" of the handwritten entries, substantial evidence requires that Commerce's inference of input by U.S. affiliates into the U.S. price be based on some likelihood, not a mere "possible interpretation" that is not otherwise corroborated by record evidence.

Finally, Commerce and Domestic Producers emphasize the significant portion of SG&A expenses of the U.S. affiliates spent with respect to U.S. sales.[24] This factor was raised by Domestic Producers during the second administrative review as well, and Commerce concluded then that despite such significant SG&A expenses by the U.S. affiliates, the sales warranted EP classification. See Second Review, 62 Fed. Reg.

---

[24] POSCO contests Commerce's reliance on SG&A expenses because they claim that Commerce never properly requested the U.S. affiliates' SG&A information. POSCO Br. at 17. Commerce indicated in the Final Results that POSCO had been requested to provide such information on more than one occasion. 63 Fed. Reg. at 13,183. The court does not decide whether Commerce properly used facts available in light of the alleged failure to respond to Commerce's requests because, as discussed above, even assuming the correctness of Commerce's position, the agency's determination is not supported by substantial evidence.

at 18,432-33.  Having concluded that EP classification was

warranted despite the SG&A expenses, Commerce may not now

simply identify those expenses as the basis for an inference

that the U.S. affiliates play a significant role in setting

U.S. prices without further explanation.  As noted above,

Commerce's decision to change classification from EP to CEP

must be based on some new configuration of facts or, if based

on the same facts, Commerce must provide an explanation for

its change in approach.  See Cultivos Miramonte, 980 F. Supp.

at 1274-76.

     There is nothing in this record, including Commerce's

final determination which indicates the functions undertaken

by POSAM and GHI are of "sufficient substance" to warrant CEP

classification under existing standards.  AK Steel, 34 F.

Supp.2d at 762.  Commerce has indicated that its prior

approach to CEP and EP decisionmaking was a poor policy

choice.  It implies that a new set of standards is applicable,

yet it cites the old standards.  The application of any new

standard must be transparent.  Exactly what factors are now

discounted, and why, must be explained.  As the court has

stated previously, some clear standards are needed.  Otherwise

agency decisionmaking may descend into arbitrariness.  See

Cultivos Miramonte, 980 F. Supp. at 1274 n.7 (agency change of

practice arbitrary if "factual findings and underlying reason for change are not supported by substantial evidence").

**IV. Movement Expenses in CEP Profit Calculation**

**Background**

For purposes of CEP based U.S. price, consistent with 19 U.S.C. § 1677a(f)(2)(B), Commerce calculated the total U.S. expenses component of the applicable percentage to be applied to profit for each respondent as the sum of U.S. commissions, U.S. direct expenses, and U.S. indirect expenses. Dongbu Analysis Memorandum (Mar. 16, 1998), at 9-10, C.R. Doc. 82, Domestic Producers' App., Tab 12, at 2-3. Commerce included respondents' total movement expenses[25] in calculating the total expense amount for the denominator of the applicable percentage even though movement expenses are not included in the numerator containing U.S. expenses. Id. at 9, Domestic Producers App., Tab 12, at 2.

---

[25] The statute provides, in relevant part, that total expenses are those:

> incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise.

19 U.S.C. § 1677a(f)(2)(C).

Domestic Producers argue that Commerce's inclusion of movement expenses in the denominator reflects an impermissible construction of the statute, as held in U.S. Steel Group, 15 F. Supp.2d at 897-898.  Total expenses, Domestic Producers contend, are limited to those expenses pertaining to the production and sale of the subject merchandise and do not encompass movement expenses.[26]

## Discussion

**A.**    As a preliminary matter, Commerce argues that Domestic Producers are precluded from raising this issue for failure to exhaust their administrative remedies.  Essentially the court looks at administrative efficiency and fairness in deciding whether an issue may be raised for the first time on appeal from an antidumping duty determination.  See Alhambra Foundry Co. v. United States, 12 CIT 343, 347, 685 F. Supp. 1252, 1256 (1988) (stating exception to exhaustion doctrine "when requiring exhaustion would be futile or an insistence on a useless formality."); Budd Co., Wheel & Brake Div. v. United States, 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2

---

[26]    In more than three court cases, Commerce has not provided a reasoned explanation for its approach.  Respondent's post hoc rationale cannot substitute for explanations by the agency.  In any case, the court concludes no reasoned approach can trump the statute.

(1991) (listing cases where court has not required exhaustion of administrative remedies).

Domestic Producers raise two points on the fairness side of the scale. The first is that a court decision intervened indicating Commerce's computation method was incorrect. See U.S. Steel Group, 15 F. Supp.2d at 897-98. The second is that this was an unimportant issue at the administrative stage, as the preliminary results indicated that Dongbu's and the POSCO Group's U.S. Sales, as well as a portion of Union's U.S. sales, would be treated as EP sales. Preliminary Results, 62 Fed. Reg. at 47,425. After the final results were issued Domestic Producers had no opportunity to raise the issue.

The court generally takes a strict view of the need to exhaust remedies by raising all arguments. Intervening case law may bolster a claim that exhaustion should be waived, see Rhone Poulenc, S.A. v. United States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984), but generally more is needed. The court expects attorneys to raise the viable arguments available to them in advance of court rulings.

In Rhone Poulenc, on which Domestic Producers rely, the additional factor was that argument there would have been futile because the legal issue was settled at the agency after a full airing. See Rhone Poulenc, 7 CIT at 135-36, 583 F.

Supp. at 610-11.  In this case, it is not clear that further

argument to the agency would not have provided, at least, a

more clearly explained determination for review.  Thus, the

court is not completely swayed by the intervention of U.S.

Steel.

The court is persuaded, however, by the additional factor

of the lack of fair opportunity to raise the issue before the

agency.  It would be foolish to encourage parties to make

arguments because they might somehow become important under a

possible future scenario.  In the interest of administrative

efficiency, parties should be encouraged to address only the

issues that are currently relevant and to drop arguments that

likely will have no significant effect on the administrative

proceedings.  Accordingly, Domestic Producers were not

required to raise this argument when EP, not CEP, sales were

at issue.

**B.**    The court has fully explained in U.S. Steel and again in

Thai Pineapple Canning Indus. Corp. v. United States, 1999 WL

288772, *7-8 (Ct. Int'l Trade May 5, 1999) why Commerce's CEP

profit methodology is at odds with the statute.  The reader is

referred to those cases for a full discussion.  Suffice it to

say that whether the language of the statute is clear when

parts are read in isolation is irrelevant because when all

parts are read together the statute is clear. In constructing the percentage for allocation of total profit to U.S. price sales, Commerce must use the same categories of expenses in the numerator and the denominator because this is what 19 U.S.C. § 1677a(f), as interpreted by the SAA, requires. In contrast, Commerce requires proportionality in a ratio that <u>it</u> has created for administrative convenience and is not constructing the ratio required by the statute enacted by Congress. Movement expenses appear to be excluded from the denominator by the statutory language describing the denominator, and from the numerator by the statutory language describing it. More importantly, because movement expenses are excluded from the numerator of the ratio they are to be excluded from the denominator so that a genuine ratio for purposes of allocation of total profit may be established. What factors Commerce considers in determining actual profit, which is allocated by the ratio, is not determinative of the construction of the ratio.

## V. Interest and Other Indirect Selling Expenses

### Background

Commerce asked the POSCO Group, with respect to U.S. sales, to provide transaction-specific data on indirect selling expenses incurred both in the home market and the

United States, and to report inventory carrying costs incurred both in the home market and the Unites States.  See Questionnaire, at C-37-39, Def.'s App., Ex. 4, at 2-4.  With respect to each of these variables, the POSCO Group responded that the reporting requirements were "not applicable because all of POSCO's and POCOS' sales are export price sales."  See POSCO Questionnaire Response (Nov. 19, 1996), at C-59-61, P.R. Doc. 53, Def.'s App., Ex. 2, at 2-4.

In a supplemental questionnaire, Commerce again instructed the POSCO Group to provide information regarding U.S. indirect selling expenses and inventory carrying costs, specifically indicating that these data might be required for Commerce's calculations in the Final Results.  Supplemental Questionnaire (Jan. 17, 1997), at 37, P.R. Doc. 65, Def.'s App., Ex. 15, at 2.  Again, the POSCO Group declined to provide the requested information.

Thus, when Commerce determined in the Final Results that the POSCO Group's U.S. sales should be reclassified as CEP transactions, the record did not include the data required to adjust CEP, pursuant to 19 U.S.C. § 1677a(d)(1).  See Final Results, 63 Fed. Reg. at 13,183.  Commerce did not make an interest adjustment in the Final Results.

Domestic Producers filed a ministerial error allegation, pursuant to 19 C.F.R. § 353.28 (1997), arguing that Commerce inadvertently omitted from its final calculations certain interest selling expenses incurred by the POSCO Group's U.S. affiliates[27] in the United States.  Ministerial Error Allegation (Mar. 31, 1998), at 2, C.R. Doc. 90, POSCO App., Tab 16, at 2.

The POSCO Group defended Commerce's original decision, arguing that the Department correctly excluded interest expenses from its calculation of U.S. indirect selling expenses and that any interest expense incurred by its U.S. affiliates was captured by the imputed credit expense as reported.  POSCO Response to Ministerial Error Letter (Apr. 3, 1998), at 2, P.R. Doc. 212, Def.'s App., Ex. 17, at 2.  The POSCO Group also argued that Commerce's "standard practice is not to include interest expenses in the calculation of U.S. indirect selling expenses in order to avoid the double-counting of expenses."  Id.

Commerce analyzed the parties' ministerial error allegations and concluded that the agency had indeed committed the error alleged by Domestic Producers.  Ministerial Error

---

[27]    Domestic Producers name [    ] and POSAM as affiliates.  Ministerial Error Allegation (Mar. 31, 1998), at 3, C.R. Doc. 90, POSCO App., Tab 16, at 3.

Analysis Memorandum (Apr. 15, 1998), at 5, P.R. Doc. 216,

Def.'s App., Ex. 18, at 4.  Commerce issued an Amended Final

Determination using facts available information for the

interest adjustment.  See Amended Final Results, 63 Fed. Reg.

at 20,573.

Commerce stated, in response to POSCO's separate

ministerial error allegation as to the indirect selling

expense calculation, that it had not intended to exclude

"commissions" or "bank charges" from its calculations of

indirect selling expenses for U.S. sales of POCOS merchandise,

and that it had meant to include the relevant rental operating

expenses in question in its calculation of indirect selling

expenses for U.S. sales.[28]  Ministerial Error Analysis

Memorandum, at 3-4, Def.'s App., Ex. 18, at 2-3.  Thus, it

denied POSCO's ministerial error claim.

### Discussion

POSCO does not seriously challenge the use of facts

available under 19 U.S.C. § 1677e (1994), if an interest

adjustment is warranted.  POSCO is correct in not emphasizing

this issue, as it had sufficient opportunity to provide this

---

[28]     Commerce's Amended Final Results mirror the analysis set forth in its April 15, 1998 memorandum.  Compare Amended Final Results, 63 Fed. Reg. at 20,573, and Ministerial Error Analysis Memorandum, at 4-5, Def.'s App., Ex. 18, at 3-4.

data.  It was, at least, twice requested by Commerce.  Even though it relates to CEP, which POSCO objects to, POSCO took the risk in not providing the data knowing that in this case Commerce might elect to use an approach to U.S. sales requiring it.

POSCO does challenge both the timing and the substance of the adjustment.  Commerce has provided the court very little to go on.  It is difficult to tell whether this is a mere ministerial error, which can be made after the final results, because Commerce does not explain the substance of its approach.  Nor does Commerce explain why the amount it chose is a proper facts available amount.  Is this an adverse selection pursuant to 19 U.S.C. § 1677e(b)?  If the Department did make an adverse inference, what is the basis for its selection?

If CEP is used on remand, Commerce should explain its interest methodology and whether it was a standard methodology which was merely overlooked.  Further, Commerce must explain in more detail its rejection of POSCO's ministerial error claim.  A contrast of the different treatment of the two claims might be enlightening.

## VI. Warehousing Expenses

### Background

In order to make proper price adjustments, Commerce asked respondent Union to report transaction-specific data concerning U.S. post-sale warehousing expenses and to provide narrative descriptions of its U.S. warehousing practices during the POR. Union Questionnaire (Sept. 19, 1996), at C-34, P.R. Doc. 11, Def.'s App., Ex. 19, at 2. Following Union's response, Commerce sought more specific information pertaining to U.S. sales for which the terms indicated that Union would pay demurrage and handling, but for which none had been reported. Union Supplemental Questionnaire (Jan. 10, 1997), at 19, C.R. Doc. 17, Def.'s App., Ex. 21, at 3. Commerce accepted Union's response, which explained that no warehousing expenses had been incurred for the sales in question. Final Results, 63 Fed. Reg. at 13,187. Union stated that it had received free warehousing according to the terms of a storage agreement.[29] Union Verification Memorandum (June 30, 1997), at 16, P.R. Doc. 38, Def.'s App., Ex. 23, at 6. The sales marked "warehoused and delivered" ("W&D") but

---

[29] Union provided Commerce with documentation supporting its alleged agreement with [    ]. Specifically, the agreement allowed [    ]. Union Verification Memorandum (June 30, 1997), at Ex. 29, P.R. Doc. 38, Def.'s App., Ex. 23, at 10.

without expenses recorded, were instances in which the customer picked up the merchandise immediately upon arrival. Union Response (Feb. 21, 1997), at 55, P.R. Doc. 23, Def.'s App., Ex. 22, at 2.

During verification, upon examination of five of Union's transactions (observations 83, 203, 484, 735, and 736), Commerce determined that Union had incurred no warehousing expenses. See Union Verification Memorandum, at 11-12, 16, Def.'s App., Ex. 23, at 4-6. Commerce concluded that there were no deficiencies or contradictions in Union's explanations concerning its reporting of U.S. warehousing expenses. Final Results, 63 Fed. Reg. at 13,187. Domestic Producers allege that Union did not report warehousing expenses for numerous U.S. sales and that these are expenses "incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States," pursuant to 19 U.S.C. § 1677a(c)(2)(A). Domestic Producers therefore contend that Commerce failed to properly verify the information upon which it relied and that the agency's conclusions are not supported by substantial evidence.

### Discussion

As noted, at verification, Commerce elected to examine a sample of the sales for which no warehousing expenses were reported. Domestic Producers' independent examination of the sales verified by Commerce reportedly revealed "gaps" (time windows between shipping to the warehouse and shipping to the customer) in a majority of the observations, although a minority contained gaps of more than five days.[30] Domestic Producers report what they deem to be suspicious correlations between the terms of sale associated with certain sales and the gaps for those sales. Domestic Producers claim these discrepancies indicate periods for which Union must have incurred unreported warehousing expenses. Moreover, Domestic Producers claim that, of the five sales Commerce examined closely, three show evidence of warehousing expenses. Domestic Producers argue that Commerce failed to satisfy the requirements of 19 U.S.C. § 1677m(i)(3) (1994), pursuant to which the agency shall "verify all information relied upon in making . . . a final determination in a review," and that the agency's decision regarding warehousing expenses is

--------

[30] The record shows gaps in [  ] of the [  ] observations, [  ] of which involve gaps ranging from [   ]. See Domestic Producers' Br. at 29-30 (citing Union's U.S. Sales Database).

unsupported by substantial evidence in the record.  The court remands to the agency on this issue.

Commerce enjoys "wide latitude" in its verification procedures.  See American Alloys, Inc. v. United States, 30 F.3d 1469, 1475 (Fed. Cir. 1994); Carlisle Tire & Rubber Co. v. United States, 9 CIT 520, 532, 622 F. Supp. 1071, 1082 (1985) ("It is within the discretion of Commerce to determine how to verify" and "due deference will be given to the expertise of the agency.") (citation omitted).  Verification "is not intended to be an exhaustive examination of the respondent's business."  Monsanto Co. v. United States, 12 CIT 937, 944, 698 F. Supp. 275, 281 (1988).  Thus, Commerce has the discretion to choose a spot-check sampling procedure rather than a comprehensive examination of each sale.

Domestic Producers also complain that the agency did not look past the supporting documents it deemed credible.  For instance, the agency presumed that the document,[31] which Union presented to account for periods during which merchandise was warehoused without a warehousing expense, was in fact a binding contract covering the period of review.  Domestic Producers note that in Al Tech Specialty Steel Corp. v. United

---

[31]    This document sets forth the storage and handling policies of [    ], dated May 31, 1994.  Union Verification Memorandum, at Ex. 29, Def.'s App., Ex. 23, at 10.

<u>States</u>, this court determined that "an absence of contradictory evidence, in and of itself, does not meet the verification requirements of 19 U.S.C. § 1677m(i)."  1998 WL 661461, *4 (Ct. Int'l Trade Sept. 24, 1998).  To meet the requirement, <u>Al Tech</u> held that Commerce must establish record evidence supporting or authenticating the "factual statement upon which Commerce relies in making a final determination in an administrative review."  <u>Id</u>.

The contract accepted by the agency to support the verbal statement <u>is</u> the sort of support or authentication referred to in <u>Al Tech</u>.  The court defers to the agency's sensibility as to the depth of the inquiry needed.  In the absence of evidence in the record suggesting the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value.[32]  See <u>PPG Indus., Inc. v. United States</u>, 15 CIT 615, 620, 781 F. Supp. 781, 787 (1991) ("[W]hen Commerce finds the information submitted by a respondent 'to be complete and its explanations sound, it may need no further information.'") (quotation omitted).

---

[32]  To conclude otherwise would leave every verification effort vulnerable to successive subsequent attacks, no matter how credible the evidence and no matter how burdensome on the agency further inquiry would be.

If the court deems Commerce's verification procedures to

be manifestly inadequate, the proper result would be remand to

the agency, not substitution of a verification plan devised by

an interested party.  As this court has already made clear,

> Domestic Producers are not independent investigators
> with power to re-verify Commerce's verification . .
> . .  They may not usurp Commerce's role as
> fact-finder and substitute their analysis of [the]
> data for the result reached by Commerce in the
> Verification Report.  Moreover, the court will not
> supersede Commerce's conclusions so long as it
> "applies a reasonable standard to verify materials
> submitted and the verification is supported by such
> relevant evidence as a reasonable mind might
> accept."

AK Steel, 34 F. Supp.2d at 772-73 (citation omitted).

Accordingly, having found the verification methodology

acceptable, the court turns to a review of Commerce's

warehousing expense decision based on an examination of the

three selected observations contested by Domestic Producers.

**Observation 203**

This transaction involved a substantial delay between the

entry date and shipment date[33] caused by the customer's initial

refusal to purchase the product.  Union explained to Commerce

---

[33]     The record shows a gap of [  ] for observation 203.
Union Verification Memorandum, at 16, Def.'s App., Ex. 23, at
6; see also Union's U.S. Sales Listing for Observations 83,
203, 484, 651 (Aug. 8, 1997), at 1, Union's App., Tab 8, at 1.

that the customer agreed to store the merchandise pending

negotiations, and that Union ultimately paid the customer

compensation in settlement of their dispute.[34]  Union

Verification Memorandum, at 16, Def.'s App., Ex. 23, at 6.

Domestic Producers contend that Union failed to provide

evidence of the compensation payment, and that the "free

storage" agreement between Union and its customer does not

account for the three weeks between the sale's entry and

delivery to the customer.  Commerce examined the contract and

found no evidence that Union failed to report warehousing

expenses.  Final Results, 63 Fed. Reg. at 13,187.  Defendant

explains that Commerce found that Union was fully responsive

to the Department's concerns, and that Union offered a

reasonable explanation for the delay between entry date and

shipment date.  Gov't Br. at 57.

Domestic Producers claim that Union incurred warehousing

expenses during the period that its customer stored the

merchandise.  This ignores the fact that the consumer was

storing the merchandise for itself, however, and not for

Union.  Thus, there is no reason Union would have incurred

storage charges during the period of the dispute.  The court

---

[34]    Union produced the contract it had with the customer, [    ]. Union Verification Memorandum, at Ex. 29, Def.'s App., Ex. 23, at 11-12.

finds that Commerce's determination was reasonable and

supported by substantial evidence.

**Observation 484**

Domestic Producers assert that the undisclosed location

of the subject merchandise in observation 484 during a short

gap[35] between the reported entry date and shipment date proves

that warehousing expenses were incurred.  At verification,

Union explained to Commerce that the coils at issue were

picked up by the customer the same day they were shipped to

the warehouse.  Union Verification Memorandum, at 11, Def.'s

App., Ex. 23, at 4.  Domestic Producers complain that Union

failed to demonstrate that the customer actually picked up the

product on the same day it was delivered.  They also point to

the labeling of the transaction as "Warehoused & Delivered,"

and refer to a document which they claim identifies the

warehouser.[36]  See Union Verification Exhibit 25 (undated), at

34-35, C.R. Doc. 38, Domestic Producers' App., Tab 6, at 34-

35.  The document shows that merchandise was delivered from an

entity otherwise absent from the record to a warehouse.  It is

---

[35]     The gap for observation 484 was a period of [    ].
Union's U.S. Sales Listing for Observations 83, 203, 484, 651,
at 1, Union's App., Tab 8, at 1.

[36]     The document refers to delivery from [    ] to [    ]
on [    ].  Union Verification Exhibit 25 (undated), at 34-35,
C.R. Doc. 38, Domestic Producers' App., Tab 6, at 34-35.

not discernable, however, whether the merchandise delivered

was part of observation 484, or even that it could be tied to

Union at all.  Union defended, with reference to different

documentation, that the coils in question

were delivered to the warehouse prior to the date indicated on

the document mentioning the mystery company.[37]  Union

Verification Memorandum, at 11 and Ex. 25, Def.'s App., Ex.

23, at 4 and 9.

Judicial review of an agency determination is limited.

Timken Co., 12 CIT at 962, 699 F. Supp. at 306.  The court may

not reject an agency's factual finding on the basis of simply

a differing interpretation of the record.  Id.; see also

Consolo, 383 U.S. at 619-20.  When conflicting inferences are

drawn from the record evidence, "the decision as to the

credibility of the evidence . . . is well within the province

of Commerce and this court will not disturb it."  Usinor

Sacilor v. United States, 19 CIT 711, 725, 893 F. Supp. 1112,

1127 (1995), (citing Timken, 12 CIT at 962, 699 F. Supp. at

306).

After reviewing the record evidence, Commerce determined

that Union's explanation was valid.  The document cited by

---

[37]    Union reported that the merchandise in question was
delivered to [   ] on [   ].  Union Verification Memorandum,
at Ex. 25, Def.'s App., Ex. 23, at 9.

Domestic Producers does not undermine the substantial evidence that warehousing expenses were not incurred.  The court therefore upholds Commerce's decision regarding observation 484.

**Observation 83**

The record shows that this transaction involved a significant gap between date of entry and date of shipment to the customer.[38]  Union's U.S. Sales Listing for Observations 83, 203, 484, 651, at 1, Union's App., Tab 8, at 1.  Union explained that no warehousing costs were incurred for a time,[39] as per the agreement with its warehouser, and that expenses for the remaining period were paid by the U.S. customer. Union Verification Memorandum, at 16, Def.'s App., Ex. 23, at 6.  Domestic Producers complain that no evidence links the document submitted by Union to observation 83, or proves that the U.S. customer in fact paid for the remaining warehousing costs.

As indicated, Commerce may make credibility determinations when examining record evidence.  Usinor Sacilor, 19 CIT at 725, 893 F. Supp. at 1127.  Commerce

---

[38]    The delay was for a period of [    ].  Union's U.S. Sales Listing for Observations 83, 203, 484, 651, at 1, Union's App., Tab 8, at 1.

[39]    [    ]

appropriately deemed that Union's document supported the truth and the accuracy of Union's explanation.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and "more than a mere scintilla." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  Union's document meets this threshold.  The court therefore finds the document, if applicable, to be substantial evidence.

It is not clear, however, whether the observation 83 sale met the conditions for free warehousing as stated in Union's document.[40]  Even if Commerce relied on Union's representation that the warehousing was indeed free of charge, it is also unclear whether Commerce had substantial evidence accounting for free warehousing beyond the period described in Union's document.

As discussed above, Commerce was within its discretion in electing to examine only a sample of the set of observations, rather than all of them.  Commerce's conclusions as to four of the five examined sales are accepted by the court.  Domestic Producers did not challenge two of Commerce's conclusions.

---

[40]    The record does not show that the transaction involved [    ] as stated in the [    ] storage and handling policy. Union Verification Memorandum, at Ex. 29, Def.'s App., Ex. 23, at 10.

Two more, observations 203 and 484, have withstood scrutiny by this court. The court therefore remands to Commerce to clarify whether the record contains substantial evidence for its decision as to observation 83. If Commerce is unable to support its decision on this record, the agency must conclude that observation 83 is not verifiable, and is instructed to re-assess its overall decision on warehousing expenses accordingly.

## VII.  Conclusion

This matter is remanded for reconsideration of the selection of CEP rather than EP for POSCO's U.S. sales. If relevant to its remand determination, Commerce shall also reconsider its treatment of indirect selling expenses and shall recalculate profit. Commerce's determinations relative to POSCO's normal value are upheld. Commerce's determination as to Union's warehousing expenses is remanded.

Remand results are due within 45 days of the date of this opinion.  Objections are due 15 days thereafter, responses 11 days thereafter.

_____
Jane A. Restani
Judge

DATED:    New York, New York

This 20th day of October, 1999.